[No. A108911. First Dist., Div. Two. Mar. 30, 2006.]

PAUL ANDREWS et al., Plaintiffs and Appellants, v.
FOSTER WHEELER LLC, Defendant and Respondent.

**COUNSEL**

Brayton & Purcell, Allan R. Brayton, Gilbert L. Purcell and Lloyd F. LeRoy for Plaintiffs and Appellants.

Carroll, Burdick & McDonough, James G. Scadden, David M. Rice, Lee G. Sullivan; Jackson & Wallace and Julie Torres for Defendant & Respondent.

**OPINION**

**LAMBDEN, J.**—Plaintiffs Paul and Eileen Andrews seek reversal of the trial court's grant of summary judgment in favor of defendant Foster Wheeler LLC (Foster Wheeler). We affirm the trial court's judgment because plaintiffs have not established a triable issue of fact regarding causation.

## BACKGROUND

In September 2003, plaintiffs filed products liability claims in superior court in San Francisco against dozens of manufacturers, suppliers, and contractors for allegedly causing the asbestos-related disease suffered by Paul Andrews (Andrews), then 70 years old, as a result of exposure to asbestos during his years of employment. Among other things, the complaint set forth a history of Andrews's work as a laborer, deckhand, and gunner's mate for over 20 years at multiple naval facilities and on naval vessels, including the USS Brinkley Bass (Brinkley Bass). On October 14, 2004, plaintiffs filed an amendment to their complaint which identified Foster Wheeler as the entity sued under the fictitious name "DOE 1."

The trial court granted plaintiffs' motion below for trial preference and scheduled a trial date for approximately nine months after the filing of the original complaint. Foster Wheeler obtained three relatively short trial continuances, and then moved for summary judgment.

In support of summary judgment, Foster Wheeler contended, based on two undisputed facts, that plaintiffs had no evidence that Andrews was exposed to asbestos from any Foster Wheeler equipment. Foster Wheeler pointed out that Andrews had admitted in deposition that he had no knowledge of Foster Wheeler, of having worked with or in the presence of anyone working with Foster Wheeler products, or of ever being exposed to asbestos as a result of any action by or interaction with Foster Wheeler. Foster Wheeler also contended as an undisputed fact that plaintiffs did not identify any facts supporting their claim in their answers to Foster Wheeler's special interrogatories, which interrogatories sought all of plaintiffs' knowledge about Andrews's exposure to asbestos from Foster Wheeler products. We provide the details of plaintiffs' responses in the discussion, *post*.

In their opposition to Foster Wheeler's summary judgment motion, plaintiffs relied on a handful of facts about the Brinkley Bass and two expert declarations, from Charles Ay and Kenneth Cohen, which we also detail further in the discussion. Plaintiffs contended that Andrews, as a result of visits to the Brinkley Bass boiler room after his arrival onboard in 1966, had

been exposed to asbestos fibers previously released into the air from asbestos-containing gaskets in Foster Wheeler condensers and then "re-entrained" into the air.

Foster Wheeler argued in its summary judgment motion reply that plaintiffs' "re-entrainment" theory was speculative as a matter of law; based on inadmissible evidence contained in Ay and Cohen's expert declarations, which inadmissibility Foster Wheeler challenged with expert declarations of its own; and failed to establish causation because the expert opinions lacked any reasoned explanation or factual basis.

The trial court granted summary judgment, finding that Foster Wheeler had met its initial burden of demonstrating that plaintiffs were not in possession of any evidence to support their claim, and that plaintiffs had failed to meet their burden of presenting admissible evidence that created a triable issue of fact. At hearing, the court stated: "The argument that given the unusual nature of asbestos fibers, some fibers from the original gasketing must necessarily have remained in the boiler room over the course of all of these overhauls, as a result of which Mr. Andrews must have been exposed to fibers that are 20 and 25 years old that have been sitting there and sort of lurking in the machinery is, in this court's view, unacceptably speculative."

This timely appeal followed.

## DISCUSSION

Plaintiffs argue that the trial court erred by failing to find that Foster Wheeler did not meet its initial burden of production of evidence in support of its summary judgment motion, and by improperly weighing the evidence each side submitted via expert declarations in the course of concluding that plaintiffs' expert evidence was too speculative to support their claim. Both arguments lack merit.

### I. *Applicable Legal Standards*

The trial court's summary judgment rulings are subject to de novo review. (*Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 69 [81 Cal.Rptr.2d 360] (*Scheiding*).) "In performing our de novo review, we must view the evidence in a light favorable to plaintiff as the losing party [citation], liberally, construing [his] evidentiary submission while strictly scrutinizing [Foster Wheeler's] own showing, and resolving any evidentiary doubts or ambiguities in plaintiff's favor." (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768–769 [107 Cal.Rptr.2d 617, 23 P.3d 1143].)

"A motion for summary judgment must be granted if all of the papers submitted show 'there is no triable issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law. In determining whether the papers show . . . there is no triable issue as to any material fact the court shall consider all of the evidence set forth in the papers, . . . and all inferences reasonably deducible from the evidence . . . .' (§ 437c, subd. (c).) A defendant has met its burden of showing a cause of action has no merit if it 'has shown that one or more elements of the cause of action . . . cannot be established, or that there is a complete defense to that cause of action. Once the defendant . . . has met that burden, the burden shifts to the plaintiff . . . to show . . . a triable issue of one or more material facts exists as to that cause of action or a defense thereto. The plaintiff . . . may not rely upon the mere allegations or denials of its pleadings to show . . . a triable issue of material fact exists but, instead, shall set forth the specific facts showing that a triable issue of material fact exists . . . .' (*Id.*, subd. (o)(2);[1][citations].)" (*Scheiding, supra,* 69 Cal.App.4th at p. 69.)

As our Supreme Court has noted, "[s]ummary judgment law in this state, however, continues to require a defendant moving for summary judgment to present evidence, and not simply point out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854 [107 Cal.Rptr.2d 841, 24 P.3d 493] (*Aguilar*); accord, *Saelzler v. Advanced Group 400, supra,* 25 Cal.4th at p. 768 [burden shifts to the opposing party " 'upon a "showing" that one or more elements of the cause of action cannot be established' "].) "There is a triable issue of material fact if, and only if, the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar,* at p. 850, fn. omitted.) Thus, "the party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Ibid.*) Circumstantial evidence supporting a defendant's summary judgment motion "can consist of 'factually devoid' discovery responses from which an absence of evidence can be inferred," but "the burden should not shift without stringent review of the direct, circumstantial and inferential evidence."[2] (*Scheiding, supra,* 69 Cal.App.4th at p. 83.)

---

[1] Code of Civil Procedure section 437c, subdivision (o) was redesignated section 437c, subdivision (p) after *Scheiding.*

[2] We note that "stringent" is defined as "imposing rigorous standards of performance; severe." (American Heritage Dict. (4th College ed. 2000) p. 1716.) In other words, a court's review must consider all aspects of the record with the strictest degree of scrutiny.

■ To ultimately prevail in their underlying claim, plaintiffs would need to establish that Andrews's exposure to a product attributable to Foster Wheeler was to a reasonable medical probability a substantial factor in contributing to any asbestos-related disease suffered by him, pursuant to the standard of proof articulated in *Rutherford v. Owens-Illinois, Inc.* (1997) 16 Cal.4th 953, 974–977 [67 Cal.Rptr.2d 16, 941 P.2d 1203]. (See also *Lineaweaver v. Plant Insulation Co.* (1995) 31 Cal.App.4th 1409 [37 Cal.Rptr.2d 902] [discussing the substantial factor test with regard to claims involving asbestosis].) Relevant considerations include the "[f]requency of exposure, regularity of exposure, and proximity of the asbestos product to plaintiff . . . although these considerations should not be determinative in every case. [Citation.] Additional factors may also be significant in individual cases, such as the type of asbestos product to which plaintiff was exposed, the type of injury suffered by the plaintiff, and other possible sources of plaintiff's injury." (*Lineaweaver v. Plant Insulation Co., supra,* 31 Cal.App.4th at p. 1416.) "The substantial factor standard is a relatively broad one, requiring only that the contribution of the individual cause be more than negligible or theoretical." (*Rutherford v. Owens-Illinois, Inc., supra,* 16 Cal.4th at p. 978.)

## II. *Foster Wheeler Met Its Initial Burden of Production*

We first examine plaintiffs' contention that Foster Wheeler, as the defendant below, did not meet its initial burden of producing evidence sufficient to make a prima facie showing that plaintiffs cannot establish causation.

We pick up where we left off in *Scheiding, supra,* 69 Cal.App.4th 64, to analyze whether Foster Wheeler met its initial burden of production. In *Scheiding,* we discussed the quantum of evidence a defendant must show when moving for summary judgment in order to shift the burden of production to the plaintiff. Scheiding and his wife brought an action against hundreds of defendants following his diagnosis with asbestosis and asbestos-related pleural disease, alleging he had been injured from asbestos exposure during his work as a laborer and electrician. (*Id.* at p. 67.) Dinwiddie, allegedly liable as a general contractor at various jobsites during Scheiding's career, moved for summary judgment for lack of causation, and offered as support for its motion Scheiding's failure in deposition to identify any jobsite where Dinwiddie was a general contractor. (*Ibid.*) It was undisputed that neither Dinwiddie nor any other defendant ever asked Scheiding to identify any jobsite where Dinwiddie had been present. (*Ibid.*) Plaintiffs, rather than submit any evidence of causation, claimed that Dinwiddie had not carried its statutory burden of "showing" that the element of causation could not be established.

This court agreed with the *Scheiding* plaintiffs because no one had asked Scheiding about Dinwiddie's role at any of his jobsites. As *Aguilar, supra,* 25 Cal.4th 826, and *Saelzler v. Advanced Group 400, supra,* 25 Cal.4th 763, later made clear, a defendant cannot simply "argue" that a plaintiff lacks sufficient evidence to establish causation; the defendant must make an affirmative "showing" that the plaintiff *cannot* do so. While we acknowledged that circumstantial evidence supporting a defendant's summary judgment motion "can consist of 'factually devoid' discovery responses from which an absence of evidence can be inferred," we also noted "that the burden should not shift without stringent review of the direct, circumstantial and inferential evidence." (*Scheiding, supra,* 69 Cal.App.4th at p. 83.) We found that "it would be unreasonable to infer from this record that plaintiffs can produce no other evidence to link Dinwiddie to [Scheiding's] illness. This record does not reflect whether any party ever asked [Scheiding] specifically whether he had any information placing Dinwiddie at any of his work sites. . . . [W]e can infer nothing at all with respect to questions which were neither asked nor answered." (*Id.* at p. 81.) We held Dinwiddie was not entitled to summary judgment in the absence of "questions aimed specifically at the presence or absence of Dinwiddie at jobsites . . . . It is entirely possible plaintiffs could have supplied further information concerning Dinwiddie." (*Id.* at p. 83.)

In *Scheiding, supra,* 69 Cal.App.4th 64, we did not consider directly whether or not any particular response to a comprehensive discovery request was "factually devoid." This is our focus in the present case. Foster Wheeler based its summary judgment motion on plaintiffs' minimal discovery responses, contending both that its discovery, in the form of Andrews's deposition and special interrogatories, was comprehensive and that plaintiffs' factually devoid responses indicated that they could not prove causation. Plaintiffs contend that their discovery responses provided facts sufficient to require denial of summary judgment and, moreover, that these responses pointed to further discovery that Foster Wheeler should have pursued in order to meet its initial burden of production. As we discuss, *post,* we conclude that Foster Wheeler is correct.

## A. *Andrews's Deposition Testimony*

Andrews's deposition testimony made clear that he had no knowledge himself that he was exposed to one of Foster Wheeler's asbestos-containing products. Plaintiffs do not contend otherwise, but simply argue this testimony was not sufficient to conclude they could not ultimately obtain evidence necessary to prevail in their claim. This might be the case, if it were not for plaintiffs' interrogatory answers.

### B. *Plaintiffs' Special Interrogatory Answers*

Foster Wheeler propounded a series of special interrogatories which called for all facts regarding Andrews's exposure to asbestos from Foster Wheeler's products. Plaintiffs' answers made clear that they did not have specific evidence of such an exposure.

Foster Wheeler's "Special Interrogatory No. 2" asked plaintiffs to identify "each fact" in support of their contention that Foster Wheeler was liable to them as alleged in their complaint. In response, plaintiffs merely stated that Andrews had "during his working career" been "exposed to asbestos-containing boilers manufactured, constructed, assembled, supplied and/or distributed" by Foster Wheeler "as more fully described below." Plaintiffs followed this statement with a list of a number of ships, including the Brinkley Bass, and two school districts, including the "location of exposure" and the "exposure dates," which appeared to be nothing more than the jobsite locations and Andrews's dates of employment. This list was followed by a one paragraph description of plaintiffs' job duties on these ships and at these school districts. Despite plaintiffs' initial qualification that Andrews's exposure to Foster Wheeler's products was "as more fully described below," they did not refer to any Foster Wheeler products in the remainder of their response, instead referring generally to Andrews's exposure and/or knowledge of asbestos-containing materials at various jobsites. With regard to the Brinkley Bass, plaintiffs stated:

"Plaintiff . . . served aboard the USS BRINKLEY BASS, which he boarded at Long Beach Naval Shipyard, Long Beach, California. Plaintiff recalls asbestos-containing pipe covering on the steamlines. Plaintiff visited shipmates in the boiler room. Plaintiff recalls that the boiler was insulated inside and out with asbestos-containing material."

This answer was insufficient to support a claim. It contains little more than general allegations against Foster Wheeler and does not state specific facts showing that Andrews was actually exposed to asbestos-containing material from Foster Wheeler's products.

Foster Wheeler propounded other special interrogatories in its effort to obtain all of the facts known to plaintiffs regarding Andrews's exposure to Foster Wheeler's products. Plaintiffs provided little, if any, substantive information in reply.

For example, Foster Wheeler asked plaintiffs to state the basis for their contention that Foster Wheeler was liable to them as alleged in their complaint. Plaintiffs answered by incorporating their answers to special interrogatory No. 2, and by repeating that during his work at the jobsites listed, Andrews "was exposed to asbestos-containing FOSTER WHEELER boilers and/or boiler components constructed, assembled, supplied and/or distributed by defendant FOSTER WHEELER."

Foster Wheeler asked plaintiffs to identify for each exposure to an asbestos-containing product manufactured by Foster Wheeler every fact, location, date, employer, and type of work or activity engaged in, and how the exposure occurred. In each case, plaintiffs simply referred to their answers to special interrogatory No. 2.

Plaintiffs included the names of several people from the Brinkley Bass in response to an interrogatory calling for the identification of coworkers and supervisors during the times of each alleged exposure to Andrews, and provided a list of depositions in other cases in response to an interrogatory calling for the identification of the depositions of individuals who had knowledge of relevant facts relating to each exposure. However, Foster Wheeler also asked plaintiffs to identify each person having knowledge of facts *and the facts known* regarding each asbestos exposure. Rather than provide *any* facts known to these persons, plaintiffs merely referred to their list of coworkers and supervisors and their answer to special interrogatory No. 2.

Foster Wheeler asked plaintiffs to describe the physical appearance and packaging of each asbestos-containing product of Foster Wheeler's to which Andrews was exposed. Plaintiffs again relied entirely on their answer to special interrogatory No. 2 without any further elaboration.

As can be seen by this review, plaintiffs answered comprehensive interrogatories by stating in effect that they had no specific facts supporting their claim against Foster Wheeler. Furthermore, plaintiffs stated as part of their answer to interrogatory No. 2 "that they have no further information responsive" to the interrogatory, an answer they incorporated into numerous other answers as well.

Plaintiffs contend we should not draw an inference of completeness from Foster Wheeler's discovery. They contend Foster Wheeler inaccurately portrayed their discovery responses, and fault Foster Wheeler for failing to refer to the elements of plaintiffs' claim addressed by Foster Wheeler's special interrogatories, or to the specific interrogatory answers that showed a lack of evidence. We find no merit in this contention. As we have discussed herein,

plaintiffs' discovery responses were devoid of material facts showing that Andrews had been exposed to a Foster Wheeler product. Foster Wheeler was correct to cite to these interrogatory answers in support of its motion, as they are prima facie evidence that plaintiffs "[do] not possess, and cannot reasonably obtain, needed evidence" to support their claim. (*Aguilar, supra,* 25 Cal.4th at p. 854.)

Plaintiffs argue that their interrogatory answers did in fact present substantive evidence to support their claim. At oral argument before this court, plaintiffs' counsel placed great emphasis on the list of persons plaintiffs had identified as having facts regarding Andrews's exposure to asbestos. Counsel argued that the list constituted information so substantial that Foster Wheeler was not entitled to summary judgment, particularly because Foster Wheeler had not deposed these people and ascertained the information they "may well have" in support of plaintiffs' claim. Plaintiffs also argue that Foster Wheeler did not establish its discovery was sufficiently thorough because it did not refer below to plaintiffs' extensive listing of depositions (in other cases) and documents in response to interrogatory No. 17, which called for all documents relating to alleged asbestos exposures.

Plaintiffs' arguments make little sense. Plaintiffs' lists of names, depositions, and documents do not raise disputed issues of material fact by themselves. This is particularly the case because plaintiffs did not provide any facts relating to Andrews's claimed asbestos exposure in response to Foster Wheeler's comprehensive interrogatories, instead relying almost entirely on its restatement of its general allegations in interrogatory No. 2. Either plaintiffs knew some additional material facts at the time that they responded to the interrogatories and chose not to disclose these facts in their interrogatory responses, or plaintiffs had no idea what additional facts were available, if any, from the people and documents listed. Either way, plaintiffs' arguments go against the reasoning of *Scheiding, supra,* 69 Cal.App.4th 63.

■ *Scheiding* presumed, as a matter of law, that plaintiffs' responses to comprehensive discovery must fully disclose the evidence known to them at the time of their responses. Parties have a duty to respond to discovery requests "as completely and straightforwardly as possible given the information available to them." (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 580, fn. 3 [37 Cal.Rptr.2d 653].) When defendants conduct comprehensive discovery, plaintiffs cannot play "hide the ball." Moreover, it is not reasonable for courts to infer pursuant to Code of Civil Procedure section 437c, subdivision (c), that defendants can discover further material facts from plaintiffs' lists of people and documents if the plaintiffs do not disclose any facts known by such persons or contained in such documents when asked to do so. In moving for summary judgment, "[t]he defendant may . . . present

evidence that the plaintiff does not possess, and cannot reasonably obtain, needed evidence—as through admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing." (*Aguilar, supra,* 25 Cal.4th at p. 855.) If plaintiffs respond to comprehensive interrogatories seeking all known facts with boilerplate answers that restate their allegations, or simply provide laundry lists of people and/or documents, the burden of production will almost certainly be shifted to them once defendants move for summary judgment and properly present plaintiffs' factually devoid discovery responses.[3]

In short, Foster Wheeler's discovery was sufficiently comprehensive, and plaintiffs' responses so devoid of facts, as to lead to the inference that plaintiffs could not prove causation upon a stringent review of the direct, circumstantial and inferential evidence contained in their interrogatory answers and deposition testimony. (*Scheiding, supra,* 69 Cal.App.4th at pp. 76, 83.) Foster Wheeler met its initial burden of presenting evidence sufficient to make a prima facie showing that triable issue of fact did not exist regarding causation. (*Aguilar, supra,* 25 Cal.4th at p. 850.) Therefore, the burden of production shifted to plaintiffs to establish a triable issue of fact regarding causation here.[4]

III. *The Trial Court Did Not Improperly Weigh Evidence*

A. *Plaintiffs' Expert Evidence Amounted to Speculation*

Plaintiffs first contend in effect that the trial court must have weighed the expert evidence submitted by the parties because their own expert evidence was rooted in fact rather than speculation. This is not the case.

---

[3] To find otherwise would not only subvert *Scheiding,* but would also encourage wild-goose chases that undermine the purpose of our modern discovery rules. (See *Pillsbury, Madison & Sutro v. Schectman* (1997) 55 Cal.App.4th 1279, 1288 [64 Cal.Rptr.2d 698] ["It is undeniable the Discovery Act was intended to bring a new form of order to civil discovery and to eliminate some of the more undesirable elements of the adversarial system, including the 'sporting theory of litigation—namely surprise at trial' "]; *McGinty v. Superior Court* (1994) 26 Cal.App.4th 204, 210 [31 Cal.Rptr.2d 292] [" 'One of the principal purposes of the Discovery Act . . . is to enable a party to obtain evidence in the control of his adversary in order to further the efficient, economical disposition of cases according to right and justice *on the merits*' "].)

[4] At oral argument before this court, plaintiffs' counsel also argued that the motion for summary judgment should have been denied because Foster Wheeler did not address plaintiff's claims that Andrews was exposed to asbestos from Foster Wheeler products at jobsites other than the Brinkley Bass, and that, therefore, the motion at best was for summary adjudication. This argument lacks merit altogether. Foster Wheeler's motion papers plainly addressed all of plaintiffs' claims. The focus on the Brinkley Bass jobsite stems from plaintiffs' opposition to the motion, discussed further, *post,* which attempted to present disputed facts regarding the Brinkley Bass jobsite alone.

The mere "possibility" of exposure does not create a triable issue of fact. (*McGonnell v. Kaiser Gypsum Co.* (2002) 98 Cal.App.4th 1098, 1105 [120 Cal.Rptr.2d 23] (*McGonnell*), citing *Aguilar, supra,* 25 Cal.4th at p. 850.) "It is not enough to produce just some evidence. The evidence must be of sufficient quality to allow the trier of fact to find the underlying fact in favor of the party opposing the motion for summary judgment." (*Ibid.*) Notably, "[p]laintiffs cannot manufacture a triable issue of fact through use of an expert opinion with self-serving conclusions devoid of any basis, explanation or reasoning." (*Id.* at p. 1106.) "[A]n expert's opinion rendered without a reasoned explanation of why the underlying facts lead to the ultimate conclusion has no evidentiary value because an expert opinion is worth no more than the reasons and facts on which it is based." (*Bushling v. Fremont Medical Center* (2004) 117 Cal.App.4th 493, 510 [11 Cal.Rptr.3d 653].)

In their opposition to Foster Wheeler's motion for summary judgment, plaintiffs did not contend that Andrews had been exposed to asbestos from a Foster Wheeler boiler, as they had in their interrogatory answers. Instead, relying on sparse facts and two expert declarations, they attempted to raise a triable issue of fact as to whether Andrews had been exposed to asbestos fibers that had been released from gaskets in Foster Wheeler condensers during ship overhauls and/or modernizations, and later "re-entrained" into the ship's air.

Plaintiffs contended that during an overhaul of the Brinkley Bass at Long Beach, California, sometime between 1966 and 1968, Andrews, who had never worked with a Foster Wheeler product, had visited the boiler room and seen tear-out, replenishment and repair work, including work on the water and steam lines. He also had seen people carrying materials out of the boiler room that he described as "raggedy beat-up dusty stuff."

Plaintiffs also submitted a 1950 Navy document, which stated that, in 1945, some 21 years before Andrews had begun his service on the Brinkley Bass, four Foster Wheeler condensers had been installed in the ship's boiler room. The document indicated that the ship had been overhauled, was soon due for another overhaul, and referred to an inspection of the condensers.

Plaintiffs' first expert was Charles Ay, an asbestos consultant certified by the State of California and the Environmental Protection Agency to sample and evaluate airborne asbestos fibers. Ay had worked from 1960 to 1981 as an insulator in the shipyard industry, including on the Brinkley Bass. He declared in a two and one-half page declaration that, based on his personal knowledge, research and examination of the types of equipment found on naval ships, including the use of packing and gaskets as a means of preventing leakage in condensers, "[p]acking and gaskets used in naval

applications commonly contained asbestos from the 1940s until at least the early 1970s." Ay continued:

"During my work at Long Beach Naval Shipyard the BRINKLEY BASS . . . came in for repairs and overhauls on multiple occasions during the 1960s. As an insulator, I performed work onboard this ship and am knowledgeable as to the lay out of the engine and boiler rooms. The main condensers on the ship were located under the high pressure turbines. The condensers' main function was to convert steam into liquid. The inlet areas of the condensers, where steam entered the tubing, contained asbestos gaskets to prevent leakage of steam. Although condensers primarily circulate cold water, the inlet areas where the steam comes in are subject to heat and pressure. Therefore, asbestos gaskets capable of withstanding the heat and pressure are required. In addition to the inlet gaskets, the tube nests found on the main condensers also contained asbestos gaskets."

Ay also stated that he understood from "naval documents evidence," which he did not further describe and which presumably was a reference to the 1950 naval document, that the condensers found on the Brinkley Bass were manufactured by Foster Wheeler, and that the Brinkley Bass had been overhauled and repaired on multiple occasions between its commissioning and the time Andrews came onboard. He further stated, without providing the source of his information, that "the ship under went [*sic*] a FRAM in the early 1960s. A FRAM is a fleet modernization and entails extensive work to modernize a ship including repair and replacement of most equipment." Ay continued:

"Gaskets typically require replacement every few years to ensure severe leaks do not occur. Given that the BRINKLEY BASS underwent various overhauls in the 1950s and 1960s, it is more likely then [*sic*] not the original gaskets found on the FOSTER WHEELER condensers were removed and replaced prior to plaintiff's service onboard. This is especially so given a FRAM was performed on the BRINKLEY BASS.

". . . The removal of multiple asbestos gaskets found on condensers such as the FOSTER WHEELER condensers on the BRINKLEY BASS, would more likely than not release respirable asbestos fibers into the surrounding areas. This is especially so during overhauls, when extensive repairs and maintenance are occurring and gaskets are typically inspected, removed and replaced. In my experience, the removal of gaskets often times requires abrasion, cutting or scrapping, increasing the release of asbestos fibers, contaminating the area."

Plaintiffs' second expert, Kenneth Cohen, was an industrial hygienist and former California Department of Industrial Relations, Division of Occupational Safety and Health inspector who had consulted on asbestos exposure levels and abatement procedures with regard to California shipyard workers in the 1960s. In an approximately three-page declaration, Cohen stated that he had studied how asbestos is released into the air and behaves once released, and that he was familiar with the physical and aerodynamic properties of asbestos "that facilitates re-entrainment and re-suspension of asbestos in an air space once it is contaminated." He continued:

"During my career, I have tested numerous environments, including ships, for the presence of airborne asbestos. During one assignment, I personally tested vessels which had been 'moth balled' for a number of years. These vessels had no machinery or engines in operation nor was work being performed on any of the insulation. The vessels' insulation was typical of asbestos-containing insulation used years earlier. During my testing, there were significant amounts of airborne asbestos throughout the ships, reaching levels of 1 fiber per cubic centimeter. In my opinion, these levels of asbestos present a significant hazard to personnel on the ship, and would have been higher when the ship was underway or in a state of maintenance or repair."

Cohen further stated that he had reviewed "thousands of asbestos air samples taken by personnel at Mare Island Naval Shipyard during shipboard activities involving asbestos products as well as data from many other naval shipyards. [¶] . . . numerous reports on the scientific literature of asbestos air sampling from ships, including sampling on naval vessels, cargo ships, barges, and tankers, and related repair and maintenance activities," materials on the "re-entrainment of asbestos fibers . . . [¶] . . . and consulted with numerous industrial hygienists and other scientists about their work involving air sampling onboard a variety of ships."

After referring to Andrews's deposition testimony, the 1950 naval document, and Ay's declaration, Cohen opined that the removal of asbestos gaskets "from ship equipment, such as the FOSTER WHEELER condensers, would more likely than not release respirable asbestos into the surrounding air." He continued:

"Portions of the asbestos fiber and dust released during the removal of the original gaskets found on the FOSTER WHEELER condensers would contaminate the surrounding air. Absent stringent abatement procedures, which I have seen no evidence of, all those entering the contaminated area would be subject to continual exposure to asbestos fiber from multiple sources including the FOSTER WHEELER gaskets.

". . . Given the aerodynamic properties of asbestos and the durability of the fiber, the above referenced asbestos fiber and dust contamination would be re-entrained and circulated throughout various ship compartments via the ship's ventilation system as well as by a number of activities, including cleaning, walking, minor repairs and vibration-generating movements within the ship."

Thus, plaintiffs theorized, Foster Wheeler condensers were onboard the Brinkley Bass at some point, and at least until 1950; overhaul and/or modernization work conducted on the ship would have included the removal of the condensers' asbestos-containing gaskets in a manner that released asbestos fibers into the air; and these fibers were "re-entrained" into the ship's air for Andrews to breath in when he visited the boiler room after he arrived onboard the ship in 1966.

Plaintiffs' theory fails because they did not establish many significant facts. Plaintiffs presented the 1950 naval document and Ay's declaration in an effort to establish that respirable asbestos fibers from Foster Wheeler's products were released at some point into the air of the Brinkley Bass. However, plaintiffs fail to show that Foster Wheeler's condensers were on the Brinkley Bass within 16 years of Andrew's arrival, relying only on the 1950 naval document's reference to them to establish their presence on the ship.

Plaintiffs also did not establish that Foster Wheeler's condensers contained asbestos, instead speculating that they did from Ay's statements that "[p]acking and gaskets used in naval applications commonly contained asbestos from the 1940s until at least the early 1970s" and that, based on his work on the ship in the 1960's (although it was not shown that Foster Wheeler's condensers were onboard the ship at that time), he understood that asbestos was "required" for the ship's condensers.

Plaintiffs also did not show that any work was done on Foster Wheeler's condensers which caused the release of respirable asbestos fibers into the air. Instead, they again resorted to speculation, based upon Ay's statement that generally speaking, gaskets from condensers were "more likely than not" removed as part of overhauls or a "FRAM," and that removal of gaskets would more likely than not release respirable asbestos fibers into the surrounding areas. However, they submitted no evidence that an overhaul or FRAM resulted in the removal of asbestos-containing gaskets from any Foster Wheeler condensers at any point in time.

■   Short of establishing these important, basic facts, plaintiffs' "evidence" that Andrews was exposed to respirable asbestos fibers from Foster Wheeler's products, even under our most lenient review, "creates only 'a dwindling stream of probabilities that narrow into conjecture.' " (*McGonnell, supra*, 98 Cal.App.4th at p. 1105; see also *Smith v. ACandS, Inc.* (1994) 31 Cal.App.4th 77, 89 [37 Cal.Rptr.2d 457] ["even under the most lenient causation standards, there must be proof that the defendant's asbestos products or activities were present at plaintiff's work site"], overruled in part on other grounds in *Camargo v. Tjaarda Dairy* (2001) 25 Cal.4th 1235, 1245 [108 Cal.Rptr.2d 617, 25 P.3d 1096]; *Saelzler v. Advanced Group 400, supra,* 25 Cal.4th at p. 781 [without knowledge of certain foundational facts, an expert's opinion was "simply too tenuous to create a triable issue" regarding causation].)

Moreover, even if plaintiffs had shown that respirable asbestos fibers from Foster Wheeler's condensers were released into the air onboard the Brinkley Bass at some point, plaintiffs still presented little more than speculation that Andrews, after boarding the ship in 1966, 16 years after the last known time Foster Wheeler's condensers were onboard, breathed in such fibers from his visits to the boiler room. Their "evidence" amounted to Cohen's speculative and conclusory assertions in his three-page declaration, which revealed little, if any, factual bases, explanation, or reasoning for his conclusions, and which were built in significant part on Ay's own speculations about the presence of Foster Wheeler asbestos-containing products on the Brinkley Bass.[5] Cohen, speculating that Andrews could have breathed in fibers that were first released into the air onboard the Brinkley Bass years before his arrival, stated in a conclusory fashion that asbestos fibers, due to their "durability" and "aerodynamic" nature, would have been "re-entrained and circulated" throughout the ship through the ventilation system and other "vibration-generating movements," and would remain onboard as long as no "stringent abatement procedures" were employed. Cohen based his view on such things as his discovery of detectable levels of respirable asbestos in unidentified tests that he had conducted on unidentified ships that had been "mothballed" for an unidentified time under unidentified conditions. He failed to explain anything

---

[5] Cohen also stated that he had reviewed the 1950 naval document, and that, "Based on my research and work on naval vessels, I concur that the condensers I came across contained asbestos gaskets to prevent leakage of incoming steam." This statement "raises more questions than it answers." (*McGonnell, supra*, 98 Cal.App.4th at p. 1106.) Among other things, it does not show the relevance of Cohen's knowledge to the present case, such as the type of research and work, the types of naval vessels, condensers and gaskets, and the period of time when they were in use.

about these tests, or unidentified reports, literature, and discussions of which he also stated he had knowledge, or even how they were relevant to proving that Andrews could have been exposed to asbestos from Foster Wheeler's products under the particular circumstances of this case.

■ In short, the Cohen declaration lacks a sufficient factual basis, and offers virtually no explanation or reasoning beyond the most general of statements about his work and research. Thus, we are unable to determine how Cohen reached his conclusions. Accordingly, his declaration "has no evidentiary value." (*Bushling v. Fremont Medical Center, supra,* 117 Cal.App.4th at p. 510.) It is particularly insufficient in light of plaintiffs' use of the opinion to posit that Andrews may have been exposed to asbestos fibers released into the air of an active naval ship almost two decades before Andrews ever came onboard. While we do not foreclose the possibility that such a theory could be supported by evidence sufficient to create a triable issue of fact under proper circumstances, the lack of a sufficiently explained and reasoned analysis here fatally undermines plaintiffs' contention that they created such an issue in opposition to Foster Wheeler's motion for summary judgment.

### B. *The Record Does Not Indicate That the Trial Court Improperly Weighed the Expert Evidence*

The record also does not support plaintiffs' contention that the trial court improperly weighed their expert evidence against Foster Wheeler's, submitted in its reply. It is established law that on a summary judgment motion, "the court may not weigh the plaintiff's evidence or inferences against the defendants' as though it were sitting as the trier of fact."[6] (*Aguilar, supra,* 25 Cal.4th at p. 856.)

Plaintiffs do not cite to anything in the record that indicates the trial court weighed the expert evidence. Foster Wheeler submitted its own expert declarations with its reply for the limited purpose of objecting to the admissibility of plaintiffs' expert evidence, and specifically stated that "[t]hey are not intended as evidence in support of the motion itself." The court did not make any reference to Foster Wheeler's expert declarations in its discussion at the summary judgment hearing or in its final order, and there is no indication in the record that the trial court considered them for any purpose. Accordingly, plaintiffs' contention that the trial court improperly weighed evidence is without merit.

---

[6] However, as we have done in the present case, the court "must nevertheless determine what any evidence or inference *could show or imply to a reasonable trier of fact.*" (*Aguilar, supra,* 25 Cal.4th at p. 856.)

## DISPOSITION[7]

The judgment is affirmed. Foster Wheeler is awarded costs.

Kline, P. J., and Haerle, J., concurred.

---

[7] In light of our opinion, we need not address various other issues raised by the parties, such as whether Foster Wheeler can raise the issue of medical probability for the first time on appeal and, conversely, whether plaintiffs have inappropriately raised new arguments regarding their discovery responses for the first time on appeal. We also strike from the record those portions of Foster Wheeler's appendix submitted to this court that have been objected to by plaintiff, an issue conceded by Foster Wheeler in a letter to the court dated August 24, 2005. In any event, we have found no reason to consider the remaining documents contained in the appendix, as we find the interrogatories propounded by Foster Wheeler that we discuss herein were sufficiently comprehensive.