Filed 9/28/23  People ex rel. Tonti v. Avee Laboratories CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### SECOND APPELLATE DISTRICT

### DIVISION ONE

| | |
|---|---|
| THE PEOPLE ex rel. ALISON TONTI, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> AVEE LABORATORIES, INC., et al., <br><br> Defendants and Respondents. | B322999 <br><br> (Los Angeles County Super. Ct. No. BC674091) <br><br> ORDER MODIFYING OPINION (NO CHANGE IN JUDGMENT) AND ORDER DENYING PETITION FOR REHEARING |

THE COURT:

The opinion in the above-entitled matter filed on August 29, 2023 is modified as follows:

1. On page 21, the entire paragraph that begins with "A defendant may also make this showing" is deleted.

2. On pages 23–24, the paragraph that begins with "Tonti argues that this evidence is insufficient to

preclude a triable question" is deleted and replaced with the following paragraph:

Tonti argues that this evidence is insufficient to preclude a triable question as to the laboratories' intent for several reasons. First, she contends that neither laboratory offered any proof that it actually performed the confirmatory urine tests billed to Blue Shield, and that if the laboratories billed for tests they never performed, this is ample basis for inferring an intent to defraud an insurer. Assuming Tonti sufficiently alleged in the operative complaint that Millennium or Avee (as opposed to the rehabilitation centers) defrauded Blue Shield by billing for tests not performed (as opposed to by performing and charging for medically unnecessary and duplicative tests), and thus that this issue is within the scope of summary judgment (see *AARTS, supra,* 179 Cal.App.3d at p. 1064), Avee's discovery responses and the declarations *are* evidence that the laboratories actually performed tests on what was presented to them as Tonti's urine. Nothing in the record contradicts these documents, nor did Tonti seek discovery that might contradict them.

3.  On pages 25–27, part B.3. of the Discussion (the heading and all text contained in that subsection, including footnote 4) is entirely deleted.

4.  At the bottom of page 28, the following sentence is deleted:

In addition, as to Avee's motion, Avee provided Tonti's factually devoid discovery responses to interrogatories requesting she identify "the basis of [her] allegation that '. . . [Living] Rebos

acted as a runner, capper, or steerer . . . to procure testing services' for Avee."

5. In the last paragraph on page 30, the first sentence of that paragraph is deleted and replaced with the following sentence:

But the only evidence Tonti identifies to support her contention that Avee did not bill her for the copayments she would otherwise owe under the terms of her insurance contract with Blue Shield is her declaration stating that she never received bills from Avee, and evidence that the amounts Avee billed Blue Shield were more than the amounts Blue Shield paid Avee.

6. The paragraph on pages 31–32 that begins, "As to Millennium," is entirely deleted (along with footnote 5) and replaced with the following paragraph and revised footnote:

As to Millennium, Tonti identifies similar evidence regarding Millennium's billing to support her contention that Millennium did not bill her for the copayments she would otherwise owe. But the explanation of benefits documents prepared by Blue Shield reflect that, under the terms of the Blue Shield insurance contract applicable to Tonti, Tonti did not have any copayment or other financial obligations for the services that Millennium charged to the insurer on her behalf.[1] Tonti has not

---

[1] Millennium represents in its brief that all of these explanation of benefits documents generated by Blue Shield and attached to the Cartier declaration reflect a $0 patient

explained—let alone presented an evidentiary basis reflecting—how Millennium's failure to bill Tonti for copayments Blue Shield concluded were not owed can support any inference regarding Millennium conferring a benefit to Sobertec.

7.  On pages 36–37, the sentence at the bottom of page 36 that begins, "The declaration provides no facts," is deleted and replaced with the following sentence:

---

responsibility amount, and Tonti does not dispute this characterization of the documents. Our own review of the documents reflects that 10 of these explanation of benefits documents show a $0 copayment obligation and a $0 amount for the portion of the services not covered by insurance. One of these explanations of benefits documents is for services dated August 5, 2014. There are also two exact copies of *another* explanation of benefits document itemizing services Millennium provided to Tonti on August 5, 2014; that document reflects that Tonti *does* have a copayment obligation, and that a portion of the charges for services Millennium provided to her are not covered. None of the Blue Shield explanation of benefits documents identifies services provided by name, but rather by billing code and using the term "office medical." (Capitalization omitted.) Given that Tonti does not dispute the characterization of these documents as reflecting Tonti has no copayment or other financial obligations for the urine testing Millennium billed to Blue Shield, she has conceded the point. Nor is evidence that Blue Shield did not pay for the entire cost of the services Millennium provided to Tonti contrary to the $0 patient responsibility amount reflected in these explanation of benefits documents, because the amount of coverage and an insured's financial obligation are distinct and unrelated issues. Tonti does not attempt to connect these two issues with evidence or argument.

4

The declaration provides no facts to establish counsel's personal knowledge, based on which he is able to declare the documents are true and correct copies of what they purport to be.

8. Due to footnote 4 (on page 26) being deleted (see *ante*, p. 2), all footnotes after page 26 are renumbered.

These modifications do not constitute a change in the judgment.

The petition for rehearing filed on September 13, 2023 is denied.

_____

ROTHSCHILD, P. J.          CHANEY, J.          BENDIX, J.

Filed 8/29/23  People ex rel. Tonti v. Avee Laboratories CA2/1 (unmodified opinion)

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE ex rel. ALISON TONTI, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> AVEE LABORATORIES, INC., et al., <br><br> Defendants and Respondents. | B322999 <br><br> (Los Angeles County Super. Ct. No. BC674091) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Michael P. Linfield, Judge.  Affirmed.

Medvei Law Group and Sebastian M. Medvei for Plaintiff and Appellant the People of the State of California ex rel. Alison Tonti.

Polsinelli, Jonathan Buck and J. Alan Warfield for Defendant and Respondent Millennium Health, LLC.

Kirkland & Ellis, Sierra Elizabeth and James R.P. Hileman for Defendant and Respondent Aveo Laboratories Inc.

1

In the instant appeal, appellant Alison Tonti (Tonti) on behalf of the People of the State of California argues the trial court erred in granting respondent Avee Laboratories, Inc.'s (Avee) and respondent Millennium Health, LLC's (Millennium) motions for summary judgment of Tonti's claim under the Insurance Fraud Prevention Act (IFPA) (Ins. Code, § 1871 et seq.; Pen. Code, §§ 549, 550, 551). Tonti further argues the court improperly excluded certain evidence she offered in opposing the motions and erred in refusing her request to continue the motions to allow her to conduct additional discovery.

We conclude respondents met their burden to show that there was no triable question of fact regarding Tonti's IFPA claim on either of the legal theories in her complaint, and that Tonti did not meet her burden to present admissible evidence sufficient to rebut that conclusion. Finally, we conclude the court did not abuse its discretion in denying Tonti's requested continuance because Tonti failed to make the necessary showing to justify the continuance under Code of Civil Procedure section 437c, subdivision (h).

Accordingly, we affirm.

## FACTS AND PROCEEDINGS BELOW

### I. Relevant Law:  IFPA

To provide context, we begin with an overview of the IFPA and the provisions most relevant to this appeal. Insurance Code section 1871.7, subdivision (a), makes it "unlawful to knowingly employ runners, cappers, steerers, or other persons to procure clients or patients to perform or obtain services or benefits . . . under a contract of insurance or that will be the basis for a claim against an insured individual or his or her insurer." (*Ibid.*)  The

2

statute does not define "runners," "cappers," or "steerers," but the terms generally refer to an individual or entity that procures clients or patients for an improper purpose. (See *State ex rel. Wilson v. Superior Court* (2014) 227 Cal.App.4th 579, 588 (*Wilson*); *People ex rel. Government Employees Ins. Co. v. Cruz* (2016) 244 Cal.App.4th 1184, 1192 (*Cruz*).) We will use the terms "steerer" or "steering" to refer to such conduct.

Insurance Code section 1871.7, subdivision (b) "prescribes civil penalties and other remedies for violation of either subdivision (a) . . . or Penal Code sections 549 . . . [or] 550." (*Wilson, supra*, 227 Cal.App.4th at p. 588.) Penal Code section 550 prohibits "[k]nowingly present[ing] or caus[ing] to be presented any false or fraudulent claim" (Pen. Code, § 550, subd. (a)(1)) under an insurance contract, or presenting, making, or preparing any "written or oral statement . . . knowing that the statement contains any false or misleading information concerning any material fact" in connection with an insurance claim. (Pen. Code, § 550, subd. (b)(1).) Penal Code section 549 prohibits "solicit[ing], accept[ing], or refer[ring] any business to or from any individual or entity with the knowledge that, or with reckless disregard for whether, the individual or entity for or from whom the solicitation or referral is made, or the individual or entity who is solicited or referred, intends to violate [Penal Code] [s]ection 550." (Pen. Code, § 549.)

The IFPA permits "[a]ny interested persons . . . [to] bring a civil action for a violation of [the IFPA] for the person and for

3

the State of California . . . in the name of the state."[1]  (Ins. Code, § 1871.7, subd. (e)(1).)

## II.  Operative Complaint

When reviewing a summary judgment, we start with the allegations of the complaint, because these frame the causes of action by which plaintiff seeks to recover.  (*AARTS Productions, Inc. v. Crocker National Bank* (1986) 179 Cal.App.3d 1061, 1064 (*AARTS*); *Sales v. City of Tustin* (2021) 65 Cal.App.5th 265, 268.)

The complaint here alleges various laboratories that conduct urine testing, including Avee and Millennium, engaged in a scheme with certain nonmedical substance abuse rehabilitation centers—respectively, Living Rebos LLC (Living Rebos), not a party to this appeal, and Sobertec LLC (Sobertec), also not a party to this appeal—to collect urine samples from patients at the rehabilitation centers for excessive and unnecessary urine testing at the laboratories for the purpose of collecting insurance compensation from the patients' insurers.

Both Living Rebos and Sobertec offer a sober living residential program and an offsite intensive outpatient program, sometimes referred to as an IOP.  Tonti is a former resident of Living Rebos's and Sobertec's respective sober living facilities, and a former participant in their IOPs.  Part of the IOP at both

---

[1] The IFPA addresses the potential for duplicative recovery, an issue not raised by this case, by further providing that, "[w]hen a person or governmental agency brings an action under this section, no person other than the district attorney or commissioner may intervene or bring a related action based on the facts underlying the pending action unless that action is authorized by another statute or common law."  (Ins. Code, § 1871.7, subd. (e)(5).)

4

facilities was laboratory testing of Tonti's urine for drugs and alcohol. Although Tonti's insurer, Blue Shield, does not provide coverage for fees associated with residence in a sober living facility, it does cover intensive outpatient programs. Living Rebos and Sobertec " 'permitted' [Tonti] to live at" each entity's respective sober living facilities without paying any out-of-pocket costs. "Instead of billing a patient's insurance for the 'sober living' services . . . the [rehabilitation center] provider[s] bill[ed] the insurance for the IOP services at a higher rate, in an intentional effort to recoup for the sober living services that are not covered." At the time she was admitted to each facility, Tonti was informed "that her insurance[,] [Blue Shield,] would cover all services." Blue Shield was charged for various services associated with Tonti's participation in the Living Rebos and Sobertec IOPs, including urine analysis conducted by Avee and Millennium. Tonti, however, never received any bills from any laboratory, including Avee and Millennium, for urine tests during her stay at either center.

The complaint further alleges that, before sending Tonti's urine samples to the laboratories for testing, the centers adequately tested the samples using their own test kits, and that further testing by any laboratory, including Avee and Millennium, was medically unnecessary. On some occasions, the centers also allegedly requested such medically unnecessary confirmatory testing by both Avee or Millennium and another laboratory. Because the laboratories' charges allegedly "far exceed the cost and necessary frequency of such treatment, . . . it is clear that [Avee and Millennium] [were] actually double billing for lab[oratory] tests, or . . . billing for unnecessary lab[oratory] tests to churn additional profits."

5

The complaint asserts this conduct violated Insurance Code section 1871.7, subdivision (a) in that it constitutes a steering scheme, and that it violated Penal Code sections 549 and 550 in that it reveals a scheme of intentionally making false insurance claims to Blue Shield.

As to the Penal Code sections 549 and 550 violations, the complaint alleges Avee and Living Rebos, and Millennium and Sobertec, "knowingly and with the intent to obtain extra payments from Blue Shield, authored, created and/or approved false, fraudulent, and misleading medical reports, records, and bills to Blue Shield for payment." Avee and Millennium both "knew, or were reckless in not knowing, that the charges they submitted were captured in other billing codes, involved excessive and medically unnecessary treatment or testing, and attempted to [obtain] payment for services not covered by Blue Shield." As to the steering scheme under Insurance Code section 1871.7, subdivision (a), the complaint alleges that Living Rebos "act[ed] as a runner, capper, or steerer . . . to procure testing services for [Avee]," and that Sobertec played the same role for Millennium. This alleged relationship involved the laboratories employing the centers to drum up demand for the laboratories' urine testing services by secretly submitting the urine of center residents to the laboratories for medically unnecessary testing.

Based on these two legal theories (Pen. Code, §§ 549, 550 & Ins. Code, § 1871.7, subd. (a) violations), Tonti alleged a single cause of action under the IFPA as a qui tam action on behalf of the state.

6

## III.  Relevant Procedural History

### A.  *Stipulated Trial Date Continuance*

The court set the initial trial date for November 26, 2018, with a fact discovery cut-off date of October 29, 2018. Defendants timely noticed Tonti's deposition, and Tonti informed them she was not available to be deposed until October 10, 2018. Although this date was before the discovery cut-off, it was after the deadline to file a summary judgment motion.  The parties therefore agreed to continue the trial date to February 25, 2019, thereby extending the deadline for summary judgment motions as well.  The court continued the trial date, but not the discovery cut-off date, and provided that no further continuances would be granted.

### B.  *Discovery*

#### 1.  *Written discovery*

Tonti sought virtually no discovery.  Tonti characterizes this as her "avoid[ing] early blunderbuss discovery because of the risk of keying in [Avee and Millennium] as to what crucial evidence to spoliate."  The only discovery Tonti propounded were form and special interrogatories to Avee on January 24, 2018, which Avee answered.  Tonti propounded no further written discovery, and did not serve any document requests.

Avee and Living Rebos served special interrogatories on Tonti, to which Tonti responded.  Millennium also propounded special interrogatories and requests for production on Tonti, but Tonti contends she "did not receive [the] requests, [and] the responses were not compelled."  Tonti never served any responses, documents, or objections to Millennium's written discovery requests.

On September 17, 2018, Avee served a demand for exchange of expert disclosures. Tonti served objections on October 8, 2018, urging that the date by which Avee demanded the disclosure (October 8, 2018) did not account for the five days' additional notice required for mail service. That same day, Avee sent a notice to all parties stating they had five additional court days for the exchange, until October 15, 2018. Respondents represented to the court below that they did not receive any expert disclosures from Tonti until December 2018, in connection with summary judgment briefing.

### 2. *Depositions*

Tonti's deposition commenced on October 12, 2018, but was not completed. After the discovery cut-off passed, the trial court found good cause for reopening discovery for the sole purpose of completing Tonti's deposition and ordered Tonti to appear for deposition. Tonti never completed her deposition.[2]

Tonti did not take any depositions or pursue any third-party discovery.

### C. *Summary Judgment*

Millennium and Avee filed motions for summary judgment.

---

[2] The dispute between the parties regarding Tonti's deposition, which relates at least in part to the treatment of personal health information, is not germane to the issues raised on appeal. We thus do not summarize the circumstances under which she did not complete her deposition.

### 1. *Evidence submitted on summary judgment*

#### a. *Millennium's and Avee's evidence*

Both Millennium and Avee argued that there was no triable issue as to their alleged intent to defraud Blue Shield, nor was there a triable issue as to their "employing" a rehabilitation center as a steerer. In support of these arguments, Millennium offered the declaration of Scott Cartier, Millennium's vice president of revenue services, based on his "personal knowledge of Millennium['s] . . . relationships with insurers and treatment centers as well as . . . processes and procedures regarding receipt of requests for laboratory testing analysis services, and billing and payment of claims for such services." Cartier also based his declaration on his "review[ ] [of] . . . the records related to the laboratory services provided by Millennium . . . to . . . Tonti," which records Millennium "maintains . . . in the ordinary course of business."

Cartier's declaration provided both general information about Millennium's practices and procedures and information specific to Tonti. Cartier declared that Millennium "performs laboratory testing services that are requested and ordered . . . by a patient's treating physician at a rehabilitation center or medical office" and "does not see or treat patients itself." Millennium "has no involvement in what tests a patient's treating physician or rehabilitation center orders or requests, and has no knowledge or involvement in whether such physicians or rehabilitation centers send samples from their patients to other laboratories for testing." Cartier declared Millennium does not employ, pay, or receive compensation from any other defendant in this case.

Cartier declared that "[d]uring the time period in which Millenium . . . provided laboratory services to . . . Tonti . . . , Millennium . . . maintained written contracts with . . . Tonti's insurer, . . . Blue Shield" and "[p]ursuant to such contracts, Millennium . . . provided requested laboratory services to Blue Shield's members in exchange for agreed upon compensation by Blue Shield for such services." The declaration attached billing records to Blue Shield for laboratory testing for Tonti and numerous "explanation of benefits" documents Blue Shield provided to Millennium "describing Blue Shield's processing and payment of . . . claim[s] submitted by Millennium . . . [regarding Tonti]." (Capitalization omitted.) The explanation of benefits documents reflect that the amount not covered by Blue Shield was $0 and that Tonti's copayment and deductible amount due to Millennium was likewise $0.

The declaration also attached "test requisition form[s] . . . sent by [Sobertec] to Millennium . . . requesting Millennium . . . perform lab[oratory] testing services for . . . Tonti." These forms appear to be forms created by Millennium, as they bear a copyright attributed to Millennium. They include a section entitled "Practice Information," in which the name and address of Sobertec has been filled in electronically. At the bottom of the section, "Dr. Montano" is handwritten on a space provided for "Requesting Provider." The forms also have a section for "Diagnosis Code(s)," and Tonti's name, gender, and date of birth, all of which are handwritten on the forms. The form contains different boxes to check to identify the tests being requested, including a box for requesting a "Custom Profile" set up by the physician that should be used to determine the tests to be performed. The "Custom Profile" box is checked on the forms

10

in the record.  In a section entitled "Patient Authorization," there is a signature.  (Full capitalization omitted.)  This section is below language authorizing Millennium to perform the testing identified on the form.  There is also a line provided for "Authorized Healthcare Provider Signature" on which no signature appears.

Avee offered the declaration of Linda Pelletier, the "revenue cycle manager of toxicology billing at Avee." (Capitalization omitted.)  Pelletier declared she "ha[s] personal knowledge of Avee's toxicology and billing practices, processes, and records, including Avee's test request and insurance billing records" and that she had "reviewed Avee's records for . . . Tonti," which records Avee "maintained . . . in the regular course of business."  Like Cartier, Pelletier declared both general information about the processes at the laboratory, as well as information regarding Tonti.  The declaration states that "Avee is a laboratory testing company and does not see patients itself. Avee performs tests that physicians request and is not able to make its own determination about which tests are medically appropriate or necessary for a particular patient."

According to Pelletier, "[i]n May and June 2014, Avee received test requests from . . . Tonti's physicians. . . . [¶] . . . Avee performed the tests that medical staff at Living Rebos requested and billed . . . Blue Shield . . . for these tests."  The declaration attaches Blue Shield explanation of benefits records and Blue Shield checks to Tonti associated with her stay at Living Rebos and testing by Avee.  Also attached are Avee billing statements addressed to Tonti at Living Rebos's address, which specified Tonti was responsible for a portion of the cost for Avee's services. The declaration further states that "Tonti was responsible for

11

[a portion of the cost] but did not pay her portion." Finally, the declaration provides that "Living Rebos is a separate company from Avee, and Avee is not privy to . . . what tests Living Rebos orders other laboratories to conduct."

Both Millennium and Avee also offered the discovery requests and responses served in the litigation and excerpts from Tonti's unfinished deposition. Portions of this discovery are summarized below in more detail, as relevant.

### b. *Tonti's evidence*

In opposing both motions, Tonti argued the laboratories had not made the showing required to shift the burden to her, and even if they had, she had successfully rebutted it with the evidence she offered. Tonti argued her evidence created a triable issue as to whether the laboratories "employed" the centers as steerers and whether the laboratories harbored an intent to defraud when they sought reimbursement from Blue Shield.

Among the evidence Tonti offered in opposing the motion was a document entitled "response to demand for exchange of expert trial witness information," which identifies Charles Hill as her expert, as well as Hill's declaration and a proof of service for both documents dated October 15, 2018. (Boldface & capitalization omitted.) Tonti describes Hill as "an expert in the addiction treatment and law enforcement field." According to Tonti, the declaration was relevant to both the intent to defraud and the steering scheme issues, and supported "that Avee['s] . . . tests were part of a corrupt practice of excessive and medically

12

unnecessary urine testing designed to generate expensive and fraudulent claims for remuneration to insurance companies."[3]

Tonti also submitted, by way of her attorney's declaration, a compilation of documents comprised primarily of internal Avee and Millennium documents, apparently produced in other litigation. Tonti describes these documents as circumstantial evidence of the laboratories' willingness to lie and defraud in order to increase the sales of their urine testing services. The collection also included what appear to be various other publicly available documents, such as public records regarding the corporate structure of the laboratories and printouts from government and news websites about the physicians the laboratories identified as having requested Tonti's urine tests. In the declaration to which these are attached, Tonti's attorney states that, based on his personal knowledge, the documents are what they purport to be. We discuss the contents of these documents as necessary in our analysis below.

Tonti also relied on her own deposition testimony, declaration, and discovery responses in which Tonti represents that she never authorized treatment by, nor interacted with, the purported prescribing physicians identified by Avee (specifically, Dr. Austin Elguindy and Dr. Mark Honzel) and Millennium (specifically, Dr. Carlos Montano) or any other licensed medical professional at the rehabilitation centers. She also cited evidence that Living Rebos and Sobertec made requests for testing on her behalf before she even enrolled in a rehabilitation center or after she had already left. She argued this evidence supports that the laboratories' testing was not medically necessary, which further

---

[3] The Hill declaration does not address Millennium specifically.

supports that the laboratories intended to defraud Blue Shield when they billed for the testing.

As to how her evidence created a triable question regarding employment of the rehabilitation centers as steerers, Tonti argued a quid pro quo arrangement existed between the laboratories and the centers that was tantamount to such an employment relationship. Tonti claimed that both laboratories waived copayments that would otherwise be due for testing Tonti's urine, as shown by the centers "repeatedly [telling her] that she would not have to pay anything for services she purportedly received." Tonti argued that, as a result of the laboratories waiving the copayments for urine testing, the rehabilitation centers were able to convince their residents to participate in intensive outpatient programs, something for which, unlike use of the center's sober living facilities, the centers could recover from Tonti's insurer. In this way, she argued, the laboratories' waiver of copayments served as compensation to the centers for steering their residents' urine to the laboratories.

### 2. *Exclusion of Tonti's evidence*

Avee and Millennium each objected to Tonti's proffered documentary evidence attached to her attorney's declaration as well as to Hill's declaration. They also moved jointly in limine to exclude Hill's declaration on the ground he was not timely disclosed as Tonti's expert. In support, counsel for four defendants submitted declarations stating that none of them had received a copy of Tonti's expert disclosure in October 2018 or at any time before Tonti filed her oppositions to the summary judgment motions.

The court sustained the objections and granted the motion in limine to exclude Hill's declaration.

### 3. *Tonti's request to reopen discovery and continue summary judgment hearing and trial*

On January 2, 2019, Tonti moved ex parte under Code of Civil Procedure section 437c, subdivision (h), to continue the hearings on the motions and to reopen discovery and continue trial. The court denied the motion, but granted her leave to conduct limited depositions of Cartier and Pelletier. Tonti, however, never deposed them.

### 4. *Order granting summary judgment*

The trial court determined that Avee and Millennium had met their initial burdens on summary judgment as to each laboratory's alleged intent to defraud and as to the employment relationship element of Tonti's steering theory. The court further concluded that the burden had then shifted to Tonti to identify admissible evidence that created a triable question of fact as to either issue, but she had failed to do so. The court therefore granted the motions.

## D. *Appeals and Appealability*

On January 29, 2019, Tonti requested, and the superior court clerk entered, a dismissal of the entire action with prejudice. Tonti attempted to appeal from the dismissal, but this court dismissed the appeal on the ground that Tonti did not have the power to dismiss an IFPA action without first obtaining consent from the trial court, and/or consent from the commissioner or district attorney. (See Ins. Code, § 1871.7, subd. (e)(1).)

On June 20, 2022, a default judgment was entered for Tonti against the defaulting defendants, who are not parties to this

15

appeal. The judgment did not mention or in any way relate to Millennium or Avee.

On August 18, 2022, Tonti filed the notice of appeal giving rise to the instant appeal, in which she purports to appeal from the June 20, 2022 judgment as a "judgment [issued] after an order granting a summary judgment motion," although no such judgment was entered in favor of Millennium or Avee on June 20, 2022 (or at any other time), and the judgment against the defaulting defendants on that date did not in any way relate to or result from the motions for summary judgment in the litigation. Nevertheless, we exercise our discretion to "amend the order granting summary judgment to make it an appealable judgment and construe the notice of appeal as applying to the judgment." (*Dover v. Sadowinski* (1983) 147 Cal.App.3d 113, 115; *Lieding v. Commercial Diving Center* (1983) 143 Cal.App.3d 72, 73–74 [nonappealable order granting motion for summary judgment treated as a judgment].)

## DISCUSSION

Tonti argues the trial court reversibly erred in (1) granting the motions for summary judgment; (2) overruling her objections to the Cartier and Pelletier declarations, excluding the Hill declaration, and sustaining Avee's and Millennium's objections to the documentary evidence attached to her attorney's declarations; and (3) denying her request to reopen discovery and continue the hearing on summary judgment and continue trial.

### I. The Court Properly Considered the Pelletier and Cartier Declarations

Because the Pelletier and Cartier declarations formed a primary basis for Avee's and Millennium's summary judgment

16

motions and the court's ruling thereon, before analyzing the summary judgment rulings themselves, we consider Tonti's argument that the trial court erred in overruling her objections to these declarations. We review such an evidentiary ruling for an abuse of discretion. (*Alexander v. Scripps Memorial Hospital La Jolla* (2018) 23 Cal.App.5th 206, 226 ["[a]lthough in *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 . . . , the California Supreme Court expressly declined to reach the issue of the appropriate standard of review for reviewing a trial court's rulings on evidentiary objections made in connection with a summary judgment motion, the weight of authority, both before and after *Reid*, holds that an appellate court applies an abuse of discretion standard under these circumstances"].) We find none.

## A.  *Pelletier Declaration*

Tonti argues the Pelletier declaration is "conclusory, incompetent and unfounded" because Pelletier "was not . . . employed by Avee Lab[oratories]" during the relevant time period. But Pelletier's declaration is based on her "personal knowledge of Avee's toxicology billing practices, processes, and records, including . . . test request[s] and insurance billing records" and her review of records maintained by Avee in the normal course of business. (See *People ex rel. Owen v. Media One Direct, LLC* (2013) 213 Cal.App.4th 1480, 1484 (*Owen*) ["[t]he personal knowledge of a witness regarding a matter may be shown by any otherwise admissible evidence, including the witness's own testimony"].) Tonti does not suggest, let alone identify a basis on which to conclude, that these practices have changed in the four years between when Living Rebos sent requests to Avee to perform the tests and when Pelletier issued her declaration. And, as to the information supporting the

17

admissibility of attached documents, a personal knowledge or foundational objection is properly overruled where, as here, a declarant states under penalty of perjury that he or she is employed by the corporation whose records and practices are described in and attached to his declaration, "and that the facts contained in [his] declaration are true and correct based on [his] own personal knowledge or based on [his] review of records." (*Ibid.*) The court did not abuse its discretion in relying on the Pelletier declaration.

### B. *Cartier Declaration*

Tonti next argues that the court should not have relied on the Cartier declaration because the declaration provides that the information therein "is true and correct . . . to the best of my knowledge, *information and belief* and based on my review of company documents maintained in the ordinary course of business." (Italics added.) Tonti cites *Bowden v. Robinson* (1977) 67 Cal.App.3d 705, 719 and *Lopez v. University Partners* (1997) 54 Cal.App.4th 1117, 1124 for the proposition that "[d]eclarations based on information and belief are insufficient to satisfy the burden of either the moving or opposing party on a motion for summary judgment or adjudication." (*Lopez, supra,* at p. 1124.) These cases stand for the noncontroversial proposition that declarations to support summary judgment must be based on "personal knowledge" (*Bowden, supra*, at pp. 719–720; *Lopez, supra*, at p. 1124) and thus must " 'show affirmatively that the affiant is competent to testify to the matters stated in the affidavits or declarations.' (Code Civ. Proc., § 437c, subd. (d) . . . .)" (*Lopez, supra*, at p. 1124, italics omitted; see *Bowden, supra*, at pp. 719–720.) But the Cartier declaration *does* " 'show affirmatively that [Cartier] is competent to testify

18

to the matters stated in the . . . declaration[ ].' " (*Lopez, supra*, at p. 1124, italics omitted.)  Specifically, as to the portions of the declaration regarding Millennium, Cartier explained at the outset of his declaration that he has personal knowledge, by virtue of his position, of Millennium's relationships with insurers and rehabilitation centers, its processes and procedures regarding receipt of requests for laboratory testing analysis services, and billing and payment of claims for such services. With regard to Tonti, although Cartier did not have personal knowledge about the testing requested for her, he declared sufficient personal knowledge of Millennium's record keeping practices to lay the foundation for the documents attached to his declaration regarding these requests.  (See *Owen, supra*, 213 Cal.App.4th at p. 1484.)  The reference to information and belief at the end of the declaration does not undo the specific personal knowledge to which Cartier elsewhere attests. The court did not abuse its discretion in relying on Cartier's declaration.

## II.    Ruling on Millennium's and Avee's Summary Judgment Motions

We now turn to Tonti's arguments directly challenging the court's ruling on the motions for summary judgment.  We review a trial court's summary judgment rulings de novo.  (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 (*Saelzler*).) "In performing our de novo review, we must view the evidence in a light favorable to [Tonti] as the losing party [citation], liberally construing her evidentiary submission while strictly scrutinizing [respondents' respective] showing[s], and resolving any evidentiary doubts or ambiguities in plaintiff's favor."  (See *ibid.*)

19

## A. *Summary Judgment Analytical Framework*

"A motion for summary judgment must be granted if all of the papers submitted show 'there is no triable issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law. In determining whether the papers show . . . there is no triable issue as to any material fact[,] the court shall consider all of the evidence set forth in the papers, . . . and all inferences reasonably deducible from the evidence . . . .' ([Code Civ. Proc.,] § 437c, subd. (c).)" (*Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 69 (*Scheiding*).) "[T]he party moving for summary judgment bears an initial burden of production to make a prima facie showing of the nonexistence of any triable issue of material fact; if he carries his burden of production, he causes a shift, and the opposing party is then subjected to a burden of production of his own to make a prima facie showing of the existence of a triable issue of material fact." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*).)

To the extent a defendant seeks summary judgment based on the lack of any evidence of a necessary element, the defendant must make a " ' "showing" that one or more elements of the cause of action cannot be established.' " (*Saelzler, supra*, 25 Cal.4th at p. 768 [burden shifts to the opposing party only after such a showing]; *Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [citing *Saelzler* for this point].) This "require[s] . . . evidence[;]" merely "point[ing] out that the plaintiff does not possess, and cannot reasonably obtain, needed evidence" is not enough. (*Aguilar, supra*, 25 Cal.4th at p. 854, fn. omitted.)

20

A defendant may also make this showing by presenting evidence of the plaintiff's " 'factually devoid' discovery responses from which an absence of evidence [to support a necessary element of the claim] can be inferred." (*Scheiding*, *supra*, 69 Cal.App.4th at p. 83.) For example, a plaintiff's responses to form discovery requests "requir[ing] plaintiffs to state all of the facts which supported [an element of the claim]" that cited beliefs, not facts, and merely "reserved the right to further respond" have been deemed "sufficient to require plaintiffs to prove their case concerning [that element]" and shift the summary judgment burden. (*Union Bank v. Superior Court* (1995) 31 Cal.App.4th 573, 580–581.)

## B. *Avee and Millennium Met Their Initial Burdens Regarding Intent To Defraud Blue Shield*

### 1. *Affirmative evidence presented by the laboratories met their initial burdens to show they had no intent to defraud*

As set forth above, to the extent Tonti's IFPA claim is based on a violation of Penal Code sections 549 or 550, it requires, inter alia, that Avee and Millennium acted with a specific intent to defraud. (See *Cruz, supra,* 244 Cal.App.4th at pp. 1192–1193; *People v. Booth* (1996) 48 Cal.App.4th 1247, 1252; *People v. Singh* (1995) 37 Cal.App.4th 1343, 1370–1371.) The only basis for inferring an intent to defraud that Tonti pleaded in her complaint was that Millennium and Avee "knew, or were reckless in not knowing, that the charges they submitted were captured in other billing codes, involved excessive and medically unnecessary treatment or testing, . . . [or] not covered by Blue Shield." On summary judgment, Millennium and Avee offered uncontradicted evidence establishing that there was no reason

21

they would have known—or were required by law to determine—whether the tests were medically necessary. Avee and Millennium offered declarations attesting that each laboratory is not involved in determining the medical need for such testing, nor in any patient's treatment plan. Further to this point with respect to Avee, Avee's interrogatory responses provided that "Avee performed and billed for tests based on orders from [Tonti's] treating physicians and does not and cannot independently choose which tests to perform." The employee declarations Avee and Millennium submitted state that each laboratory received physician requests to perform certain tests on Tonti's urine. Avee also offered its interrogatory responses, which state that two physicians had "submitted requests for analysis of [Tonti's] urine samples to Avee and specified the tests to be performed." And Millennium also provided requisition forms identifying the name of the requesting physician and the other information required by regulations.

Nothing in the record suggests that either laboratory's appropriate role was other than to perform urine testing when requested to do so in the manner set forth in Avee's and Millennium's evidence. Indeed, the applicable regulations do not require any independent determination by a laboratory as to the need for testing, and instead permit a laboratory to perform testing when requested by an authorized prescriber, such as a physician. (See Bus. & Prof. Code, § 1288 ["[a]ny person conducting or operating a clinical laboratory may accept assignments for tests only from . . . persons licensed under the provisions of law relating to the healing arts or their representatives"]; *id.*, § 1220, subd. (d)(2) [incorporating certain federal regulations into California law governing laboratory

22

testing] & 42 C.F.R. § 493.1241(a) (2023) ["[t]he laboratory must have a written or electronic request for patient testing from an authorized person"]; see also *United States ex rel. Groat v. Boston Heart Diagnostics Corporation* (D.D.C. 2017) 296 F.Supp.3d 155, 159 [concluding "a laboratory cannot and is not required to determine medical necessity, but rather is permitted to rely on the ordering physician's determination that the laboratory tests billed . . . are medically necessary"].) Nor could the frequency of the test requests on Tonti's urine provide a basis for reasonably inferring that the laboratories knew or should have known that they were requesting reimbursement for testing that was not medically necessary, given the lack of evidence in the record suggesting this frequency was somehow out of the ordinary.

Avee's and Millennium's proffered evidence supports a basis for inferring the laboratories did not harbor an intent to defraud Blue Shield.

### 2. *Tonti's arguments to the contrary are unconvincing*

Tonti argues that this evidence is insufficient to preclude a triable question as to the laboratories' intent for several reasons. First, she contends that neither laboratory offered any proof that it actually performed the confirmatory urine tests billed to Blue Shield, and that if the laboratories billed for tests they never performed, this is ample basis for inferring an intent to defraud an insurer. This argument is beyond the scope of summary judgment, because Tonti did not plead that Millennium or Avee defrauded Blue Shield by billing for tests not performed, but rather by performing and charging for medically unnecessary and duplicative tests. (See *AARTS, supra,* 179 Cal.App.3d at p. 1064.) Tonti first raised this argument in her oppositions

23

to summary judgment. Because the pleadings frame the issues on summary judgment, the lack of an allegation that either laboratory did not actually perform the tests for which they charged precludes this as a ground for opposing the laboratories' motions. (*Ibid.*) And in any event, Avee's discovery responses and the declarations *are* evidence that the tests were actually performed. Nothing in the record contradicts these documents, nor did Tonti seek discovery that might contradict them.

Tonti next argues that the Millennium requisition forms in the record were not signed by the physician identified as requesting the tests, and that this is circumstantial evidence from which the trier of fact could infer Millennium knew or should have known that a doctor did not actually request the tests. According to Tonti, if Millennium billed Blue Shield for tests Millennium knew or should have known were not properly prescribed, that would provide circumstantial evidence of an intent to defraud Blue Shield. But the law does not require the signature of the requesting authorized physician in order for a laboratory to legally perform a laboratory test; rather, it requires such a request contain certain information, such as the name of the authorizing physician and certain identifying information for the patient, all of which appeared on the requisition forms Millennium submitted. (See 42 C.F.R. § 493.1241(a) & (b) (2023).) The lack of a signature is thus not a basis on which Millennium should have known or suspected anything was amiss with the requests. Tonti further points to the prohibition of a nonmedical rehabilitation center like Sobertec to employ a physician authorized to request laboratory testing. But neither the requisition forms provided, nor any other evidence in the

24

record, suggests that the requesting physician identified on the form is employed by Sobertec or any other rehabilitation center.

Tonti next argues that a declaration, like Cartier's and Pelletier's, denying the requisite intent is not sufficient evidence of lack of requisite intent. But their declarations are not simply denials; rather, each contains a detailed description of each laboratory's practices, which is inconsistent with the only theory of intent and knowledge pleaded in Tonti's complaint.

Finally, Tonti argues that the evidence identified by Avee and Millennium is insufficient to preclude a triable question on knowledge and intent, given the evidentiary presumption that one is presumed to know and intend the natural and probable consequences of one's actions. (See Evid. Code, §§ 665, 668; *Gomez v. Acquistapace* (1996) 50 Cal.App.4th 740, 746.) But the only acts of Millennium and Avee reflected in the evidence are that they tested the urine of Tonti and billed her insurance for it. A fraudulent intent is not a natural and probable consequence of those actions.

### 3. *Avee also met its initial burden as a result of Tonti's factually devoid discovery responses regarding intent*

To support its motion for summary judgment, Avee also offered Tonti's discovery responses to Avee's interrogatories asking Tonti to identify the basis for her allegations supporting fraudulent intent.[4] These responses provide another basis on which the court could have granted Avee summary judgment. Specifically, these interrogatories asked Tonti to identify "the basis of [her] allegation that Avee 'engaged in a conspiracy,

---

[4] Tonti did not respond to Millennium's discovery requests.

25

common enterprise, and common course of conduct, the purpose of which is and was to engage in the violation of the [IFPA],' " and the "allegation that Avee 'knew, or [was] reckless in not knowing, that the charges [it] submitted were captured in other billing codes, involved excessive and medically unnecessary treatment or testing, and attempted to attain payment for services [not] covered by Blue Shield by using deceptive billing codes and medical descriptions/records.' " Tonti's response to the first of these interrogatories was comprised entirely of objections, and she responded to the second by "object[ing] on the grounds that the information sought is more readily available to [Avee] and/or third parties, who[ ] are identified in the request" and responding as follows: "[p]ropounding party and its agents, employees, and/or representatives." These responses are devoid of any facts. To the extent her limited responses can be understood as suggesting that Avee itself had evidence on these points, Tonti chose not to seek any information about it in her interrogatories to Avee, or via document requests or depositions of Avee employees or third parties—even after the trial court extended discovery for the purpose of deposing Pelletier regarding her summary judgment declaration. This "discovery was sufficiently comprehensive, and [Tonti's] responses so devoid of facts, as to lead to the inference that plaintiffs could not prove [intent] upon a stringent review of the direct, circumstantial and inferential evidence contained in their interrogatory answers and deposition testimony." (*Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 107; see *ibid*. ["[i]f plaintiffs respond to comprehensive interrogatories seeking all known facts with boilerplate answers that restate their allegations, or simply provide laundry lists of people and/or documents, the burden

26

of production will almost certainly be shifted to them once defendants move for summary judgment and properly present plaintiffs' factually devoid discovery responses"].)  This also "met [Avee's] initial burden of presenting evidence sufficient to make a prima facie showing that a triable issue of fact did not exist regarding [intent]." (*Andrews*, *supra*, 138 Cal.App.4th at p. 107.)

### C. *Tonti Did Not Produce Admissible Evidence of a Triable Issue of Fact Regarding Intent*

Tonti argues that, even if Avee and Millennium successfully shifted the burden to her to establish a triable issue of fact regarding the laboratories' intent to defraud, the admitted evidence she offered in opposition met that burden.

She argues that the requisite intent can be reasonably inferred from (1) evidence that Tonti was not treated or examined by the physicians Avee and Millennium contend requested the testing and (2) evidence that Tonti was not even a patient at the rehabilitation centers at the time some of the tests were performed.  But Tonti offers no evidence from which the trier of fact could infer that either laboratory knew that Tonti was not seen by these physicians, or that either laboratory knew when she was a patient at a particular rehabilitation center.  The evidence Tonti identified in opposition supports an inference that the tests at issue were not medically necessary—for example, because they were ordered by a physician that had never seen Tonti—but absent some basis for inferring that Millennium or Avee knew this, it is not a basis for inferring any intent or knowledge on the laboratories' behalves.

27

**D.** ***Millennium and Avee Met Their Initial Burdens of Establishing No Triable Question Existed That They Employed the Centers To Steer Business to Them***

Unlike Tonti's Penal Code section 550 theory of her IFPA claim, her theory under Insurance Code section 1871.7, subdivision (a) does not require an intent to defraud.

To establish a violation of that section (and an IFPA claim based thereon), the laboratories must have "employed" the rehabilitation center as a steerer. (*Cruz, supra*, 244 Cal.App.4th at p. 1192 [" '[t]he conduct made unlawful by [Insurance Code section 1871.7,] subdivision (a) is identified by a single verb: To employ. Subdivision (a)'s single verb makes a single act unlawful: Employment' "].) Millennium and Avee successfully showed in their summary judgment motions that no triable question existed as to such employment. Contrary to Tonti's arguments on appeal, Millennium and Avee did not merely point to a lack of evidence that they employed the rehabilitation centers as steerers. Rather, they pointed to uncontradicted evidence of the nature of their relationships with the centers, wherein the centers provide a laboratory with a testing request from a purported treating physician, and, in accordance with applicable regulations, the laboratory bills the patient's insurance for that testing. Nothing about this relationship tends to show that they "employed" the rehabilitation centers to steer business to them. In addition, as to Avee's motion, Avee provided Tonti's factually devoid discovery responses to interrogatories requesting she identify "the basis of [her] allegation that '. . . [Living] Rebos acted as a runner, capper, or steerer . . . to procure testing services' for Avee."

28

**E.** *Tonti Did Not Create a Triable Issue as to Whether the Laboratories Employed the Centers To Steer Business to Them*

Tonti argues that, even if Avee and Millennium successfully shifted the burden to her on this issue, the admitted evidence she offered in opposition met that burden. Tonti correctly notes that evidence of a formal employment relationship is not necessary, and that a triable issue can exist based on evidence that the allegedly employing entity provided some benefit to the steerer in exchange for the latter procuring patients to whom the employer could provide services. (*Cruz, supra*, 244 Cal.App.4th at p. 1198 [rental payment that exceeded fair market value could potentially reflect a payment establishing employment for the purposes of an Insurance Code section 1871.7, subdivision (a) claim].) In opposing the laboratories' summary judgment motions, Tonti offered her declaration that the centers told her that she would have no financial obligation related to her stay at their sober living facilities, as long as she also participated in a corresponding intensive outpatient program, for which she likewise would have no financial responsibility. She declared that these IOPs involved "sometimes receiv[ing] counseling, but it wasn't every day and it was never . . . clinical counseling. Most of the time was spent going to the gym, waiting around the sober living home, or providing urine samples." Tonti further declared that neither laboratory ever charged her a copayment. Her declaration outlined the amounts charged to her insurance by Living Rebos and Sobertec for her participation in their respective IOPs. She argues that these charges by the rehabilitation centers include both charges for the centers conducting point of contact testing of Tonti's urine and their

29

handling and storing of the same urine samples that they sent to the laboratories for testing.

Tonti's theory is as follows:  If the laboratories waived their copayments for laboratory testing services, as she claims they did, it would make it easier for the rehabilitation centers to convince residents like Tonti to participate in IOPs, either because the centers could have physicians order the tests without obtaining the residents' consent, or because they could convince the residents to consent to laboratory testing by promising it would not cost them anything.  And if, as declared, the centers charged Blue Shield for Tonti's participation in an IOP comprised largely of preparing urine samples for laboratory testing, one can reasonably infer that the laboratories' waiver of copayments facilitated the rehabilitation centers' collecting this insurance reimbursement for their unnecessary work—thereby conferring a benefit on the centers.  In other words, the laboratories waived their fees in order to encourage the centers to send them work.  Thus, the rehabilitation centers were given a benefit in exchange for steering the work to the laboratories.

But the only evidence Tonti identifies to support her contention that Avee did not bill her for the copayments she would otherwise owe under the terms of her insurance contract with Blue Shield is her declaration stating that she never received bills from Avee.  Under certain circumstances, that a document was not received by its intended recipient may be circumstantial evidence from which one can infer the document was never sent.  But such circumstances cannot reasonably be inferred from the evidence before the court here.  Pelletier attested to Avee having sent Tonti bills for her copayments, and her declaration attaches billing statements addressed to Tonti at

the address for Living Rebos, dated several months after Tonti's stay there concluded. That Tonti did not receive statements addressed to her at Living Rebos after she was no longer living there does not, without more, support a reasonable inference that the statements were not actually sent. Nor do we see anything untoward about Avee addressing these statements to Tonti at the Living Rebos facility address, as this is the only address the evidence supports Avee had for Tonti.

As to Millennium, the only evidence Tonti identifies to support her contention that it did not bill her for the copayments she would otherwise owe are the explanation of benefits documents prepared by Blue Shield reflecting that, under the terms of the Blue Shield insurance contract applicable to Tonti, Tonti did not have any copayment obligations for the services that Millennium charged to the insurer on her behalf.[5] Tonti has

[5] Millennium represents in its brief that all of these explanation of benefits documents generated by Blue Shield and attached to the Cartier declaration reflect a $0 copayment obligation, and Tonti does not dispute this characterization of the documents. Our own review of the documents reflects that 10 of these explanation of benefits documents show a $0 copayment obligation and a $0 amount for the portion of the services not covered by insurance. One of these explanations of benefits documents is for services dated August 5, 2014. There are also two exact copies of *another* explanation of benefits document itemizing services Millennium provided to Tonti on August 5, 2014; that document reflects that Tonti *does* have a copayment obligation, and that a portion of the charges for services Millennium provided to her are not covered. None of the Blue Shield explanation of benefits documents identifies services provided by name, but rather by billing code and using the term

not explained—let alone presented an evidentiary basis reflecting—how Millennium's failure to bill Tonti for copayments Blue Shield concluded were not owed can support any inference regarding Millennium conferring a benefit to Living Rebos.

## F. *Tonti's Arguments the Court Improperly Excluded Some of Her Proffered Evidence Do Not Change the Result*

Tonti argues that the court erred in excluding Hill's declaration and the documents attached to her attorney's declaration. We disagree.

### 1. *Documents regarding the prescribing physicians*

Among the excluded documents Tonti offered through her attorney's declaration were several regarding Dr. Montano, the physician Millennium identified as having requested testing on Tonti's urine, and Dr. Elguindy, one of the two physicians Avee identified as having requested such testing.

The documents regarding Dr. Montano are described as follows in Tonti's attorney's declaration: (1) a "true and correct

---

"office medical." (Capitalization omitted.) Given that Tonti does not dispute the characterization of these documents as reflecting Tonti has no copayment obligations for the urine testing Millennium billed to Blue Shield, she has conceded the point. Nor are Tonti's declared statements that Blue Shield did not pay for the entire cost of the services Millennium provided to Tonti contrary to the $0 copayment obligation reflected in these explanation of benefits documents, because the amount of coverage and an insured's copayment obligation are distinct and unrelated issues. Tonti does not attempt to connect these two issues with evidence or argument.

32

copy of an official release from the Office of Orange County District Attorney" dated July 25, 2018 "on the official letterhead of the Orange County District Attorney" "detailing a massive fraudulent urine harvesting scheme wherein . . . Montano . . . pled guilty to counts of insurance fraud" and (2) "a true and correct copy of [a July 27, 2018] article from the Los Angeles Times" regarding, inter alia, Montano's guilty plea. But Tonti concedes that Montano was still properly licensed at the time Millenium claims he requested it perform tests on Tonti's urine (i.e., in 2014). Thus, even if in 2018 Montano pleaded guilty to committing insurance fraud and the press reported as much, such facts could not support a reasonable inference that Millenium knew or should have known *in 2014* that the requests it claims it received from Dr. Montano were in some way improper or not medically necessary. Thus, even if admitted, these documents could not support a triable issue as to Millennium's intent.

The documents regarding Dr. Elguindy are described in Tonti's attorney's declaration as follows: (1) "a true and correct copy of a printout from the Los Angeles County Department of Medical Examiner—Coroner website, indicating case status for Dr. Austin T. Elguindy . . . date of death 01/12/2016[,]" (2) "a true and correct copy of a medical board decision pertaining to . . . Elguindy . . . obtained from the Department of Consumer Affairs website located at dca.ca.gov via search of [his] name" reflecting he "was placed on a three[-]year probation effective September 26, 2012, in connection with a felony conviction[,]" and (3) "a true and correct computer printout of the November 2, 2010 article titled 'Lake Elsinore: Man jailed in road-rage clash' from the Press-Enterprise, a Riverside publication," which appears to involve Dr. Elguindy. That Dr. Elguindy died two years after he

33

purportedly ordered the tests on Tonti's urine is of no assistance to Tonti in creating a triable issue of fact regarding Millennium's intent to defraud Blue Shield by performing those tests. Nor do the documents purporting to reflect that Dr. Elguindy was on probation with the California Medical Board at the time Avee claims to have received testing requests from him support a reasonable inference that Avee knew or should have known such requests were not medically necessary, such that Avee intended to defraud Blue Cross by requesting reimbursement for them. The disciplinary document the trial court excluded provides that Dr. Elguindy's license was "revoked," but that "the revocation [was] stayed, and [he] [was] placed on probation for three (3) years on [certain] terms and conditions." Nothing in the record supports an inference that a doctor on probation is not qualified to order medical tests, let alone an inference that the laboratories intentionally requested reimbursement for tests they knew Dr. Elguindy had ordered at a time he was not so qualified.

Thus, even if the court erred in excluding any of these documents regarding Drs. Elguindy and Montano, any such error was not prejudicial.

### 2. *The Hill declaration*

Citing *Staub v. Kiley* (2014) 226 Cal.App.4th 1437, 1446-1447, Tonti argues that Avee's demand for exchange of expert designations on "a premature date" (italics omitted) abolished her obligation to timely designate an expert, and thus that the court abused its discretion in excluding the Hill report as untimely. In *Staub*, the court excused an untimely expert disclosure on the basis that the demand to which it was responding was not in " 'complete and timely compliance with [Code of Civil Procedure] [s]ection 2034.260' " (*Staub, supra*, 226

34

Cal.App.4th at p. 1446) because it, like Avee's demand here, requested exchange only 20 days after it was served by mail, thereby failing to allow for the additional five days that section requires as a result of mail service. (*Id.* at pp. 1446–1447.) But a demand for expert disclosures is not forever "void" because it is untimely, nor does "the statute . . . state that an 'internally defective' demand cannot be amended." (*Zellerino v. Brown* (1991) 235 Cal.App.3d 1097, 1108.) Here, unlike in *Staub*, the evidence supports that Avee's "mistake was innocent and the steps [Avee] took to correct it were reasonable" (*id.* at p. 1109)— namely, immediately upon the error being brought to Avee's attention, Avee agreed to give Tonti the initially-omitted five extra days, thereby ultimately complying with the statutory timeline. Where, as here, the recipient of an internal defective expert demand refuses to participate in the exchange despite such good faith efforts to correct the defect, and "instead treat[s] the issue as some sort of tactical windfall[,]" the party is not excused from complying with the demand as corrected.[6]

---

[6] To the extent Tonti argues that the court erred in excluding the Hill report as untimely because Tonti actually *did* timely serve an expert disclosure regarding Hill, this presents a factual issue, which we review for substantial evidence. Accordingly, we must resolve all evidentiary conflicts and draw all legitimate inferences in favor of the trial court's decision and, where the evidence supports more than one inference, we may not substitute our deductions for those of the trial court. (*Lake v. Reed (*1997) 16 Cal.4th 448, 457.) The court was presented with a declaration of Tonti's counsel attesting to having served the disclosure in October 2018, and declarations of Avee's counsel and Millennium's counsel, attesting to their never having received such a disclosure. On this record, substantial

(*Zellerino, supra*, 235 Cal.App.3d at p. 1111.)  The court did not abuse its discretion in excluding the Hill report.

### 3.    *Documents apparently produced or filed in connection with other litigation*

The remainder of the documents attached to Tonti's counsel's declarations primarily consisted of internal Avee and Millennium documents, apparently produced in other litigation, such as emails between executives and salespeople at each of the laboratories, sales and marketing material from each of the laboratories, and internal memoranda from each of the laboratories.  The collection also included what appears to be a declaration of a former Millennium employee in prior litigation unrelated to Sobertec or Tonti.  But Tonti failed to properly authenticate any of these documents.  Authentication requires "the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is," or the establishment of such facts by other legal means. (Evid. Code, § 1400.)  Tonti argues that her counsel's declaration authenticated these documents by describing information that appears on the face of the documents—for example, the date, title, author, and recipients.  We disagree.  The declaration provides no facts to establish counsel's personal knowledge, based on which he is able to declare the documents are true and correct copies of what they purport to be, or even how each document

---

evidence supports the court's implicit factual finding that Tonti did not timely serve a notice designating Hill as an expert.

came to be in counsel's possession.**7** (Cf. *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 523 ["[a]s is routine in law and motion practice, most of [the] exhibits were authenticated through declarations submitted by [the party's] attorneys, who had personal knowledge of how [they had been] obtained . . . , how they had been identified, who had identified them, and their status as true and correct copies of the 'originals' "]; see also *The Luckman Partnership, Inc. v. Superior Court* (2010) 184 Cal.App.4th 30, 34 [finding attorney laid proper foundation where he "had personal knowledge that the documents attached to his declaration were . . . verified interrogatory responses" filed in the case].)

Accordingly, the court did not reversibly err in excluding these documents attached to Tonti's attorney's declarations.

## III.   Denial of Discovery Continuance

Finally, Tonti argues that the court abused its discretion in denying her request to reopen discovery and continue the hearing on summary judgment and trial. Tonti made this request under Code of Civil Procedure section 437c, subdivision (h), which "mandates a continuance of a summary judgment hearing upon a good faith showing by affidavit that additional time is needed to obtain facts essential to justify opposition to the motion." (*Cooksey v. Alexakis* (2004) 123 Cal.App.4th 246, 253–254 (*Cooksey*); Code Civ. Proc., § 437c, subd. (h) ["[i]f it appears from the affidavits submitted in opposition to a motion for summary

---

**7** We thus need not address what attested basis would be sufficient to properly authenticate the documents and/or whether, had Tonti's counsel provided such an attestation, the documents would be inadmissible on some other basis.

judgment or summary adjudication, or both, that facts essential to justify opposition may exist but cannot, for reasons stated, be presented, the court shall deny the motion, [or] order a continuance to permit affidavits to be obtained or discovery to be had, or make any other order as may be just"].)

Tonti argues the court lacked discretion under this section to deny her request to continue the hearing, because she supplied the requisite affidavit. "Continuance of a summary judgment hearing is not mandatory, however, . . . when the submitted affidavit fails to make the necessary showing under [Code of Civil Procedure] section 437c, subdivision (h)." (*Cooksey, supra*, 123 Cal.App.4th at p. 254.) The necessary showing is: "(1) the facts to be obtained are essential to opposing the motion; (2) there is reason to believe such facts may exist; and (3) the reasons why additional time is needed to obtain these facts." (*Wachs v. Curry* (1993) 13 Cal.App.4th 616, 623.) In connection with the third requirement, "[t]here must be a justifiable reason why the essential facts cannot be presented. An inappropriate delay in seeking to obtain the facts may not be a valid reason why the facts cannot then be presented." (*Cooksey, supra*, 123 Cal.App.4th at p. 257.) Thus, "[w]e agree with the majority of courts holding that lack of diligence may be a ground for denying a request for a continuance of a summary judgment motion hearing." (*Ibid.*)

The record here supports a lack of diligence in pursuing discovery, based on which the court acted within its discretion in denying Tonti's requested continuance. The declaration of Tonti's counsel did not establish—nor does the broader record on appeal reflect—that the additional discovery Tonti desired could not have been obtained sooner with reasonable diligence. Tonti's

counsel references concerns that defendants would have spoliated evidence, had she engaged in early discovery efforts, but identifies no specific basis for these concerns. Nor is this a legitimate reason for delaying discovery until after a motion for summary judgment is filed by the opposition. In any case, the proffered declaration does not identify any impediment to Tonti serving simple interrogatories and document requests as a means of obtaining the information the declaration identifies. Finally, the declaration blames Tonti's failure to earlier seek discovery in part on her counsel's misunderstanding of the trial date continuance as extending the discovery cut-off. But the stipulation effecting that continuance does not mention discovery deadlines, and Tonti's counsel declared he was aware no later than October 5, 2018—that is, before the close of discovery—that opposing counsel did not understand the discovery cut-off to have been extended past the end of October 2018. Tonti did not seek any discovery upon learning this, nor did she seek the court's assistance in obtaining additional time for discovery until over two months later. Code of Civil Procedure section 437c, subdivision (h) is intended " '[t]o mitigate summary judgment's harshness' " (*Frazee v. Seely* (2002) 95 Cal.App.4th 627, 634) "for an opposing party who has not had an opportunity to marshal the evidence." (*Mary Morgan, Inc. v. Melzark* (1996) 49 Cal.App.4th 765, 770.) Tonti had such an opportunity, so the court properly denied her relief under this section.

Finally, we find unpersuasive Tonti's arguments that the denial of a continuance denied her due process. The authority Tonti cites to support this argument addresses a failure to comply with local rules (not, as here, the Code of Civil Procedure) (*Garcia v. McCutchen* (1997) 16 Cal.4th 469, 475–476

39

[interpreting and applying Code of Civil Procedure section 575.2]; see also Code Civ. Proc., § 575.2, subd. (b) ["[i]t is the intent of the Legislature that if a failure to comply with [local] rules is the responsibility of counsel and not of the party, any penalty shall be imposed on counsel and shall not adversely affect the party's cause of action or defense thereto"]), and the right to a jury trial (not, as here, a discovery continuance).  (See *Cooks v. Superior Court* (1990) 224 Cal.App.3d 723, 726 [right to a jury trial which cannot be abridged out of case management concerns or other nonsubstantive defaults].)

**DISPOSITION**

The court's order on Avee's and Millennium's summary judgment motions and the judgment from which Tonti appeals are affirmed.  Respondents are awarded their costs on appeal.

<u>NOT TO BE PUBLISHED</u>.


ROTHSCHILD, P. J.

We concur:



CHANEY, J.



BENDIX, J.

41