Filed 5/14/25  York v. City of Sacramento CA3
Opinion following transfer from Supreme Court

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| FARRELL YORK,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>CITY OF SACRAMENTO et al.,<br><br>Defendants and Respondents. | C097761<br><br>(Super. Ct. No. 34-2017-00206890-CU-OE-GDS)<br><br>OPINION ON TRANSFER |

Plaintiff Farrell York filed suit against the City of Sacramento (City) and three City supervisors, alleging, among other claims, harassment and discrimination based on his age under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).[1]  The trial court granted summary adjudication in favor of defendants as to the harassment claim, and a jury later found for defendants on the remainder of York's

---

[1] Undesignated statutory references are to the Government Code.

1

claims. On appeal, York argues that the trial court erred when it granted summary adjudication on his harassment claim and when it declined to give a proposed special instruction to the jury related to his discrimination claim.

In an unpublished opinion, we concluded that the trial court correctly granted summary adjudication on York's harassment claim and appropriately declined to give the requested jury instruction with respect to his discrimination claim. We also awarded defendants costs. (*York v. City of Sacramento* (Dec. 16, 2024, C097761) [nonpub. opn.].) The California Supreme Court granted review and ordered this court to vacate its opinion and perform the analysis required by *Pollock v. Tri-Modal Distribution Services, Inc.* (2021) 11 Cal.5th 918, 947-951 (*Pollock*) before determining whether to award costs on appeal to defendants. Having done so, we will affirm the judgment but decline to award costs.

BACKGROUND

Because York appeals, in part, from an order granting a motion for summary adjudication, we will provide a summary of the relevant facts taken from the record that was before the trial court when it ruled on that motion. (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1037.)

I.

The City's Department of Utilities' Division of Operations and Management is divided into three subdivisions. Each subdivision has a superintendent who oversees employees in his or her respective subdivision. Two of those subdivisions, Water Maintenance (Water Division) and Wastewater (Sewer Division), are relevant here.

If a department had a job opening, it would post the job opening on a bulletin board, and employees interested in applying for the position could indicate their interest by giving their names to the department secretary. The superintendent of the hiring division had discretion to decide whether to accept a lateral transfer; a formal interview was not required.

2

From 2011 to 2016, the relevant period in York's complaint, Craig Robinson was the superintendent for the Water Division. Robert Jack was the superintendent for the Sewer Division until 2015. The superintendents reported to Michael Malone, the Operations and Maintenance Manager.

York first began working in the Water Division in 1990. He was promoted in 1999. York worked as a backhoe operator, and the parties agree he was good at his job. While working for the City, York also sometimes did work for a friend's construction company.

York left his employment with the City in the early 2000s. After his departure, a rumor circulated that he had resigned when it was learned that he was performing work for the construction company on City time. The parties agree that York left because the City refused to grant him a leave of absence. Around 2003, York started his own business, York Trucking.

In 2008, York applied to work for the City again, but he was not hired. In 2011, he was hired into the Sewer Division. When he was hired, York met with Malone, Robinson, and Jack. Malone told York that he was doing York "a favor by letting [York] come back," and said he "didn't want any retreads or old-timers to . . . be hired back."

II.

During his employment in the Sewer Division, York applied for several transfers and promotions. Several personnel matters relating to York's conduct also surfaced in this period.

Between 2011 and 2013, York repeatedly asked Robinson about the possibility of transferring from the Sewer Division to the Water Division, but Robinson would not give him a "straight answer." York believed that the City refused to post at least one job opening in the yard where he was stationed, but he did not know why it was not posted there. York was approximately 45 years old in 2011.

3

In 2013, York filled out paperwork for York Trucking to do work for the City. Robinson and Malone received the paperwork and canceled it after consulting with the City Attorney's Office.

In June 2014, York submitted his name to transfer to the Water Division. York did not receive the transfer and, on July 20, 2014, met with Robinson and Kevin Toney, a union shop steward, to discuss the request. In the meeting, Robinson stated that he did not accept York's transfer because he needed "younger men, [with] strong backs, not gray haired gentlemen." Robinson said York was overqualified for the position because York had been a lead worker in the Water Division before and Robinson could not bring him back at a lower position. Robinson did not want York because York knew "how to work the system" and was too "city smart." Finally, Robinson said it was his department and he could "hire who I want to."

York and Toney told Jack about the meeting with Robinson, and Jack told them to speak with Ken Fleming, the manager in the Office of Civil Rights. York spoke with Fleming.

In November 2014, an incident occurred in which York was accused of using a City-owned backhoe to remove dirt from a City stockpile for personal use. York asked Jack whether he could take the dirt; Jack told him, "[i]f you want to gamble, you can do that." A temporary supervisor saw York taking the dirt. The next workday, Jack confronted York, told him someone had seen him taking the dirt, and said he could face disciplinary action. York was transferred to a different yard, lost his backhoe privileges, and received a reduction in pay.

In February 2015, the City auditor received an anonymous whistleblower complaint alleging that York had used a City-owned backhoe to load City-owned dirt and rock into a privately owned dump truck on City time. The complaint also alleged that Jack had failed to follow proper procedures when he disciplined York after the incident. The auditor investigated the complaint and concluded that York had "used a City backhoe

4

to load dirt into a non-City vehicle during work hours and transported the dirt to his personal property," which "was an inappropriate use of City equipment for personal use." The auditor also concluded that Jack's disciplinary measures were "in question due to the lack of a formal scheduled meeting with union representation and discipline letters without employee signatures."

York contended that Jack had given him permission to take the dirt, saying it was "okay, but don't get caught." York further asserted that the temporary supervisor had been sent by Jack to take pictures of York and that Jack "set [York] up."

In July 2015, York met with Robinson about another opening in the Water Division. York asked for a panel interview; Robinson replied that it did not "matter how many people on the panel wanted [York], he [Robinson] had the last word and he was always going to say no." He said that "all the guys [York] used to work with were old and gray," that York was "outdated," and that York would "be causing too many shenanigans and . . . was too city-smart." Robinson repeated his comment about wanting "younger guys with strong backs that haven't been in the city system before." Robinson denied the request for transfer after conducting an interview; Robinson did not complete the evaluation sheet for the interview.

York complained about Robinson's comments to Kevin Guerra, a union shop steward. York asked Guerra to file a grievance on his behalf, but did not know if Guerra actually did so. Shelley Banks-Robinson, the City Labor Relations Manager at the time, did not receive any such grievance. Banks-Robinson, however, generally instructed her staff not to discuss any issues or cases involving Robinson, who was her husband, with her and to instead relay them to her supervisor or the City Attorney.

York attempted to follow up on the transfer decisions, and in 2015 or 2016, York met with Malone to discuss them. York told Malone about his meeting with Robinson and relayed Robinson's statement that "he needed younger guys with strong backs" and

5

did not want people with gray hair. Malone said he would "look into it." This was the first time York had told Malone about the comments.

In August 2015, York also met with Bill Busath, Director of the Department of Utilities. He told Busath about Robinson's age-related remarks and asked about his transfer attempts. Busath agreed to look into it and to set up a meeting with York, Malone, and Robinson to discuss the issue. York contends that Busath called him a liar in the conversation.

Busath met with Robinson and Malone. Robinson denied making the statements about York's age and said that, based on his past interactions with him, York "lacked integrity." Robinson also drafted a memo to Busath detailing his interactions with York. The memo recounted York's history at the City, including the potential contract with York Trucking, the City dirt incident, and poor work assessments from Jack. The memo concluded that Robinson's decision was "not based on [York's] skills and abilities but solely on his character. [York] has shown that he does not have the integrity that I need to see for him to work for me."

Busath later told York why he had not been transferred. York became angry and said he "would never be able to overcome his previous mistakes." Busath told York that labor relations should be involved in any future discussions on the topic. According to York, Busath said he would always back his superintendents and accused York of lying.

Busath referred York to Fleming, and York and Fleming eventually spoke on the phone. York was never informed of the results of his complaint.

In October 2015, York received intermittent leave under the Family Medical Leave Act (29 U.S.C. § 2601 et seq.) and California Family Rights Act (§ 12945.1 et seq.) (FMLA/CFRA) for emotional stress through April 2016.

Also in October 2015, York took a promotional examination for a position in the Water Division. York scored last out of nine candidates. York did not know who scored the exam, and Robinson did not have any input into the exam score.

That same month, Robinson filed a complaint of racial discrimination involving York, Busath, and Toney. Robinson said that he was offended by York and Toney's allegations (presumably about Robinson's age discrimination with respect to York) and was hoping a formal investigation would show that he had not caused any harm to York. After the complaint was investigated, Robinson concluded that he (Robinson) "had blown everything pretty much out of proportion."

In December 2015, York filed a charge with the Equal Employment Opportunity Commission (EEOC) asserting age and disability discrimination, harassment, and retaliation.

York also applied for a promotion to lead worker in the Sewer Division. York's name was placed in the number one rank on the eligibility list. York interviewed in front of a panel of five supervisors in February 2016. The panel members concluded that York seemed unprepared and did not perform well. He did not obtain the position. No one on the panel made any remarks related to York's age.

York applied again for a lead worker vacancy in the Sewer Division in March 2016. The panel again concluded York was unprepared, and he was not selected for the position.

In March 2016, York again requested a transfer to the Water Division. He interviewed in front of a panel composed of Robinson and two other supervisors in the Water Division. The panel decided not to transfer York. Robinson's opinion about York had not changed since the last two transfer requests. Another supervisor thought York "was used to being treated more favorably and [was] not a good worker as a result" because York's grandfather had worked for the City. Robinson did not tell this supervisor about his conflicts with York, and the supervisor did not know York's age.

In September 2016, the EEOC held a mediation between York and the City in response to York's charge. In the mediation, York asserted that his supervisor, Mike Thomas, had referred to him in multiple conversations with others as a "pussy" for taking

FMLA/CFRA leave. This was the first time York made this allegation. The City retained an outside investigator who substantiated York's claim.

On December 12, 2016, York resigned from the City.

III.

In January 2017, York filed suit against the City, Robinson, Malone, and Thomas. His complaint alleged six causes of action, including (1) harassment based on age under FEHA; (2) discrimination based on age under FEHA; (3) discrimination based on the FMLA/CFRA; (4) retaliation based on the FMLA/CFRA; (5) retaliation based on a violation of FEHA; and (6) failure to prevent harassment, discrimination, and retaliation under FEHA. The first cause of action, for harassment based on age under FEHA, was pleaded against the City, Robinson, Malone, and Thomas. The remainder of the claims were asserted against the City alone.

On October 15, 2021, defendants filed a motion for summary judgment or, in the alternative, summary adjudication. Among other arguments, they challenged York's first cause of action for age harassment, arguing that the conduct alleged was not actionable because it did not rise to the level of severe or pervasive harassment. As to the second cause of action for age discrimination, the motion contended that York was not constructively discharged and that the City had legitimate, nondiscriminatory reasons for declining to transfer and promote him.

The trial court granted defendants' motion as to York's harassment claim but denied it as to the other causes of action. With respect to the harassment allegations, the trial court concluded that Robinson's two age-related comments, which were made approximately one year apart, were not sufficiently severe or pervasive to support a claim of age-related harassment, even if viewed together with Malone's comment about hiring "retreads." The trial court declined to consider the other incidents York cited as evidence of harassment, including the fact that his requests for transfers and promotions had been

8

denied, because, the court concluded, those incidents supported a discrimination claim but not a claim of harassment.

With respect to York's age discrimination claim, the trial court recognized defendants' arguments that the City's failure to promote or transfer York was based on legitimate, nondiscriminatory reasons related to his integrity and poor performance in promotional exams and interviews. But the court could not "disregard the alleged age-related comments made by Robinson." Construed in the light most favorable to York, that evidence, along with evidence that the City failed to investigate the statements, created a triable issue of material fact regarding whether the reasons for declining to transfer or promote York were pretextual. The court was "persuaded that a reasonable trier of fact could conclude that Defendants engaged in intentional discrimination."

The discrimination claim, along with the other remaining causes of action, proceeded to trial. The jury returned a verdict in favor of the City as to all claims. With respect to the discrimination claim, the jury returned a special verdict form finding that the City had taken adverse actions against York when it failed to transfer and promote him, but that his age was not a substantial motivating reason for those actions.

York filed a motion for a new trial contending, among other things, that the trial court had erred when it refused York's request to give a special jury instruction defining pretext as part of its instructions addressing his discrimination claim. The trial court denied the motion.

DISCUSSION

I.

On appeal, York contends that the trial court erred when it granted summary adjudication as to his harassment claim. We disagree.

A.

Under FEHA, it is unlawful "[f]or an employer . . . or any other person, because of . . . age, . . . to harass an employee . . . ." (§ 12940, subd. (j)(1).) In 2018, the Legislature

9

adopted section 12923 to clarify various standards that apply to harassment claims. (Stats. 2018, ch. 955, § 1.) Among other provisions, the statute provides that "harassment creates a hostile, offensive, oppressive, or intimidating work environment and deprives victims of their statutory right to work in a place free of discrimination when the harassing conduct sufficiently offends, humiliates, distresses, or intrudes upon its victim, so as to disrupt the victim's emotional tranquility in the workplace, affect the victim's ability to perform the job as usual, or otherwise interfere with and undermine the victim's personal sense of well-being." (§ 12923, subd. (a).)

To prevail on a claim that a workplace is hostile under FEHA, an employee must show that he or she was subjected to harassing conduct that was unwelcome, because of the employee's protected characteristic, and sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment. (*Bailey v. San Francisco Dist. Attorney's Office* (2024) 16 Cal.5th 611, 627 (*Bailey*).) " '[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." ' " (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 462; see also *Bailey*, at p. 629 [court considers allegations from the perspective of a reasonable person belonging to the same group as the plaintiff].) "Whether a work environment is reasonably perceived as hostile or abusive 'is not, and by its nature cannot be, a mathematically precise test.' [Citation.] 'The working environment must be evaluated in light of the totality of the circumstances.' [Citation.] ' "These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." ' . . . ' "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious)" ' are not sufficient to create an actionable claim of harassment." (*Bailey*, at p. 628.) But a "single incident of harassing conduct is sufficient to create a triable issue regarding the existence of a hostile work environment if the harassing

10

conduct has unreasonably interfered with the plaintiff's work performance or created an intimidating, hostile, or offensive working environment." (§ 12923, subd. (b).)

"A trial court properly grants a motion for summary judgment only if no triable issue exists as to any material fact and the defendant is entitled to judgment as a matter of law." (*Bailey*, *supra*, 16 Cal.5th at p. 620.) The moving party bears the burden of demonstrating that " 'the plaintiff "has not established, and cannot reasonably expect to establish, a prima facie case." ' " (*Ibid.*) A defendant moving for summary judgment can meet the burden of showing that a cause of action has no merit by showing that one or more elements of the cause of action cannot be established. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of one or more material facts exists as to the cause of action. (*Ibid.*) The Legislature has directed that "[h]arassment cases are rarely appropriate for disposition on summary judgment." (§ 12923, subd. (e).)

"On appeal, we examine the record de novo, viewing the evidence in the light most favorable to the plaintiff as the losing party and resolving any evidentiary doubts or ambiguities in [his or] her favor." (*Bailey*, *supra*, 16 Cal.5th at p. 620.) "We exercise our independent judgment as to the legal effect of the undisputed facts [citation] and must affirm on any ground supported by the record." (*Jimenez v. County of Los Angeles* (2005) 130 Cal.App.4th 133, 140.) We draw reasonable inferences in favor of the nonmoving party. (*Miller v. Department of Corrections*, *supra*, 36 Cal.4th at p. 470.) " ' "First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue." ' " (*Barclay v. Jesse M. Lange Distributor, Inc.* (2005) 129 Cal.App.4th 281, 290.)

## B.

In this case, the trial court ruled that defendants were entitled to summary adjudication on York's harassment claim because York could not establish that defendants' age-related conduct was severe or pervasive. York argues that this was error, pointing to workplace incidents, including: (1) Robinson's two statements about wanting younger men with strong backs, rather than men with gray hair; (2) Malone's statement about avoiding "retreads or old-timers"; (3) Thomas's statement to others that he thought that York was a " 'pussy' for taking FMLA time"; (4) that Malone "backed" Robinson when York complained about Robinson's statements; (5) that negative rumors about York circulated in the workplace; (6) that York was "castigated" for his attempt to refer business to York Trucking; (7) that the City ignored York's complaint of age discrimination "for a long time"; (8) that Robinson filed an "admittedly false" complaint of racial discrimination targeting York; (9) that the City declined to promote York within the Sewer Division; and (10) that the City refused to transfer him to the Water Division.

We conclude that these incidents, viewed together in context, do not establish a triable issue of fact as to whether York was subjected to severe or pervasive conduct based on his age that altered the conditions of employment or created an abusive work environment. Beginning with the statements of Robinson, Malone, and Thomas, it is clear that derogatory comments, particularly when (like here) they are made by a supervisor, can constitute actionable harassment. (*Bailey*, *supra*, 16 Cal.5th at p. 627 [harassment includes " '[v]erbal harassment' such as 'epithets, derogatory comments or slurs on a basis enumerated in' " FEHA, quoting Cal. Code Regs., tit. 2, § 11019, subd. (b)(2)(A)]; *Bailey*, at p. 633 [status of speaker may be a significant factor in measuring severity of harassing conduct].) In this case, however, the four comments—while inappropriate and offensive—were spread out over an approximately five-year period. None of the statements was physically threatening or intimidating. And while Robinson's statements were directly age-related, the comment by Thomas was only

12

indirectly so, and Malone's statement could be interpreted as referring both to age and tenure with the City.

Other workplace conduct could certainly heighten the impact of these statements and contribute to a hostile or abusive work environment, but the incidents cited by York do not support such a conclusion. For example, with respect to Robinson's filing of a race discrimination complaint, the deposition testimony that York cited showed that Robinson filed the complaint out of concern that the City would approach personnel disagreements between Robinson and York in a way that would disadvantage Robinson because of his race. It did not show that the complaint was made in bad faith; nor did it allow for a reasonable inference that Robinson used the complaint to communicate a hostile message based on York's age. (See *Martin v. Board of Trustees of California State University* (2023) 97 Cal.App.5th 149, 172.)

The rumor York references, that he was forced out of his job in his first stint with the City for working for a private company on City time, appears to reach back to 2002, well before the age-related comments were made. As such, it is unclear why the rumor, or the lack of documentation thereof, would be tied to his age. The record similarly does not support York's claim that he was "castigated" for his attempt to steer business to York Trucking; he expressly states he was "not disciplined or reprimanded" for the incident. Given the absence of a connection to York's age or other harassing quality, these incidents do not assist York in establishing a dispute of material fact on his harassment claim. (See *Jones v. Department of Corrections & Rehabilitation* (2007) 152 Cal.App.4th 1367, 1379 [variety of incidents unsupportive of harassment claim because they were " 'akin to being a collection of isolated and objectively non-discriminatory events' "].)

York's contentions that Malone "backed" Robinson and that the City failed to promptly investigate York's claim of age discrimination likewise do not assist York because he failed to identify the evidence supporting these contentions. An appellant must "[s]upport any reference to a matter in the record by a citation to the volume and

page number of the record where the matter appears." (Cal. Rules of Court, rule 8.204(a)(1)(C).) An appellate court has "no duty to search the record for evidence and may disregard any factual contention not supported by proper citations to the record." (*Air Couriers Internat. v. Employment Development Dept.* (2007) 150 Cal.App.4th 923, 928; see also *Sharabianlou v. Karp* (2010) 181 Cal.App.4th 1133, 1149 [court "will not scour the record on our own in search of supporting evidence," and if parties fail to direct us to where in the record we can find the necessary evidence, "they cannot complain when we find their arguments unpersuasive"].) Because York does not point us to relevant evidence in the record, we are unable to consider these arguments. For a similar reason, we likewise do not consider York's broad assertions that an 81-page passage of the record contains evidence of harassing conduct.

With respect to the City's decisions not to transfer or promote York, we agree with York that evidence of discriminatory workplace personnel decisions may support a harassment claim. (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 708.) Our state Supreme Court has explained that, in some cases, official employment actions may convey a hostile message, and "therefore evidence that would otherwise be associated with a discrimination claim can form the basis of a harassment claim." (*Ibid.*)

This principle, however, does not support York on the particular facts here because at trial the jury rejected York's discrimination claim after explicitly finding that York's age was not a substantial motivating reason for the City's actions—with "substantial motivating reason" defined to mean: "[A] reason that actually contributed to the alleged adverse employment actions against Farrell York. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the alleged adverse employment actions." "[F]acts found by the trial court following trial may be relevant to the question whether error in a pretrial ruling was prejudicial so as to warrant reversal of the judgment." (*Westlye v. Look Sports, Inc.* (1993) 17 Cal.App.4th 1715, 1742, fn. 19; see also *Federal Deposit Ins. Corp. v. Dintino* (2008) 167 Cal.App.4th 333, 343 ["In

14

general, an order denying a motion for summary judgment or summary adjudication does not constitute prejudicial error if the same question was subsequently decided adversely to the moving party after a trial on the merits," italics omitted].) Because harassment requires a finding that the employee was subjected to harassing conduct because of his or her protected characteristic (*Bailey*, *supra*, 16 Cal.5th at p. 627) and the jury in this case determined that age did not motivate the personnel actions, those actions cannot support York's harassment claim.

Given the sum of the statements and incidents above and looking at the totality of the circumstances, we conclude that a reasonable trier of fact could not find that the complained-of conduct was sufficiently severe or pervasive to alter the conditions of employment or create a work environment that qualifies as hostile or abusive to York because of his age.

In reaching this conclusion, we find informative decisions, issued after the enactment of section 12923, in which appellate courts have held that a triable issue of fact precluded the grant of summary judgment. In *Bailey*, our state Supreme Court held that there was a triable issue of fact as to whether harassing conduct was sufficiently severe or pervasive where the plaintiff's co-worker walked up to the plaintiff and "quietly said, 'You [N-words] is so scary.' " (*Bailey*, *supra*, 16 Cal.5th at pp. 621, 634.) The co-worker's statement was an unambiguous racial epithet that a jury could conclude was " 'degrading and humiliating in the extreme.' " (*Id.* at p. 634.) Moreover, the jury could find that the modifier " 'scary' further heightened the slur's impact," and the plaintiff was unable to distance herself physically or otherwise from the co-worker. (*Ibid.*)

In *Beltran v. Hard Rock Hotel Licensing, Inc.* (2023) 97 Cal.App.5th 865, 871, an employee asserting a claim of sexual harassment provided evidence that the general manager's conduct was "persistently inappropriate." He would "wink at her every time he walked by . . . . When he greeted her, he would 'reach in for a handshake' " and then massage the inside of her hand, pull away slowly, and caress it; and he asked

inappropriate questions. (*Ibid.*) On one occasion, he slapped or groped her buttocks. (*Id.* at pp. 870, 880; see also *Wawrzenski v. United Airlines, Inc.* (2024) 106 Cal.App.5th 663, 697 [employees made offensive comments about plaintiff's body on a monthly basis, commented on her " 'butt,' " and her supervisor and others required her to change her uniform based on its fit on her body].)

In *Ortiz v. Dameron Hospital Assn.* (2019) 37 Cal.App.5th 568, an employee was subjected to multiple statements about her national origin, age, and English skills over the course of approximately one year. Ortiz's supervisor stated that she (the supervisor) " 'was tired of attending meetings where Filipinos and minority workers over 40 were present,' " that Filipino employees were " 'old dummies and they don't speak English and I want to get rid of all of them,' " and that they were " 'dumb,' " " 'didn't speak English,' " and " 'ma[d]e too much money.' " (*Id.* at pp. 574-575.)

Each of these cases involved significantly more severe and intimidating conduct. In all but one of the cases, the conduct repeated itself during a shorter period of time. In York's case, as noted above, the harassing statements were comparatively isolated, as they were spread over an approximately five-year period.

Finally, relying on *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854, York argues that the trial court did not hold defendants to their burden because the summary judgment standard requires a showing that a plaintiff "does not possess, and cannot reasonably obtain, needed evidence," and defendants failed to demonstrate he could not obtain the needed evidence. On summary judgment, a defendant must "*present evidence*, and not simply *point out through argument*, that the plaintiff does not possess and cannot reasonably obtain the needed evidence." (*Lona v. Citibank, N.A.* (2011) 202 Cal.App.4th 89, 110.) This can be done by providing "deposition testimony of the plaintiff's witnesses, the plaintiff's factually devoid discovery responses, or admissions by the plaintiff in deposition or in response to requests for admission that he or she has

not discovered anything that supports an essential element of the cause of action." (*Ibid.*; *Gaggero v. Yura* (2003) 108 Cal.App.4th 884, 889-890.)

Although the parties do not discuss the full scope of their discovery, it appears to have been extensive. Among other things, the parties deposed the parties to the litigation, as well as potentially percipient witnesses. With respect to the age-related comments, York testified in deposition that he could not recall other comments in the workplace, aside from those by Malone and Robinson, but volunteered to raise any others if they came to mind. York also submitted an extensive declaration in opposition to the motion for summary judgment recounting the facts relevant to summary judgment from his point of view. Taking these things together, the discovery captured the known universe of material facts as to the severity or pervasiveness of the alleged age harassment, particularly as to the age-related comments, and defendants met their prima facie burden to show that York did not possess and could not reasonably obtain evidence to support his claim. The burden of production was then on York to provide evidence showing a triable issue of material fact. (See *Andrews v. Foster Wheeler LLC* (2006) 138 Cal.App.4th 96, 107.) York does not argue that the summary judgment motion was premature; nor is this a cause of action where the relevant facts were outside of the plaintiff's own knowledge. We reject his argument that defendants did not provide evidence sufficient to meet the applicable standard.

We are mindful that summary adjudication in harassment cases should be rare. (§ 12923, subd. (e).) After examining the record and the arguments in this particular case, however, we conclude that the trial court did not err in determining that the evidence failed to disclose a triable issue sufficient to send this case to a jury.

## II.

York additionally asserts that the trial court erred when it declined to give a special jury instruction relevant to his claims of employment discrimination. We do not perceive an error in the court's decision.

17

## A.

When discussing the jury instructions, York requested an instruction on the issue of pretext. His proposed language read: "Pretext may be demonstrated by showing the City's proffered reasons for not transferring Mr. York or not promoting Mr. York had no basis in fact, or the proffered reasons did not actually motivate the refusals, or the proffered reasons were insufficient to motivate the refusals. Furthermore, pretext may also be shown by the weakness, implausibilities, inconsistencies, incoherences in the City's reasons for its actions."

The City argued that a pretext instruction was unnecessary because pretext was part of the burden-shifting framework under *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, which was not relevant once a case proceeded to trial. The court noted that the bench notes for CACI No. 2570, which provides the elements of age discrimination, state that "[b]y the time the case is submitted to the jury, the *McDonnell Douglas* shifting burden drops from the case." Thus, there was no pattern instruction for pretext because the instruction allowed the jury to decide whether the evidence showed "the employer's discriminatory intent" or the "employer's age-neutral reasons for the employment decision."

The trial court observed that a special instruction could be confusing and that it would be simpler to tell the jury it could find the employer's reasons credible or not. In addition, the existing instructions left room for York to argue that the City's proffered reasons "were trivial or they were not actually the substantial motivating reason." The court thus concluded that the existing instructions sufficiently covered the issue of pretext.

The trial court provided York an opportunity to find case law supporting his argument that a pretext instruction should be included. York could not find any cases but pointed the court to *Harris v. City of Santa Monica* (2013) 56 Cal.4th 203, which the

18

court concluded did not support York's position. The court thus declined to give the instruction.

The trial court instructed the jury on the elements of age discrimination using CACI No. 2570, which directed the jury to determine, among other elements, whether York's "age was a substantial motivating reason for the City of Sacramento's conduct." The court also read CACI No. 2507, which defined "substantial motivating reason" as "a reason that actually contributed to the alleged adverse employment actions against Farrell York. It must be more than a remote or trivial reason. It does not have to be the only reason motivating the alleged adverse employment actions."

B.

"A party is entitled upon request to correct, nonargumentative instructions on every theory of the case advanced by him which is supported by substantial evidence. The trial court may not force the litigant to rely on abstract generalities, but must instruct in specific terms that relate the party's theory to the particular case." (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 572.) Instructional error, however, " 'cannot be predicated on the trial court's refusal to give a requested instruction if the subject matter is substantially covered by the instructions given.' " (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 360.) We review claims of instructional error de novo. (*People v. Posey* (2004) 32 Cal.4th 193, 218.)

The instructions given in this case adequately covered the concept of pretext without York's proposed instruction. CACI Nos. 2570 and 2507 directed the jury to determine whether York's age was a reason that contributed to the adverse employment actions. Thus, the ultimate question before the jury was whether York's asserted rationale for the City's decisions was more believable than the City's reasons for the decisions. The issue presented in the requested instruction—whether the City's proffered reasons for its decisions were credible—was implicit in the instruction directing the jury to decide the motivating reasons behind the City's actions.

19

At the same time, York's proposed instruction risked confusing the jury.  The trial court's instructions on the discrimination claim did not refer to pretext.  An instruction defining pretext therefore would not have been connected to any finding that the jury was required to make.

We also find unpersuasive York's argument that the decision not to use the special instruction precluded York from arguing the City's reasons were pretextual.  As noted above, the jury was required to determine what motivated the City's actions.  Nothing about the existing instructions therefore impeded York's ability to argue that the City's reasoning was not credible.  Moreover, York's argument incorrectly presupposes that a showing of pretext alone establishes intentional discrimination.  It is true that "[p]roof that the employer's proffered reasons are unworthy of credence may 'considerably assist' a circumstantial case of discrimination, because it suggests the employer had cause to hide its true reasons."  (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 361.)  But "an inference of intentional discrimination cannot be drawn solely from evidence, if any, that [a defendant] lied about its reasons."  (*Id.* at pp. 360, 361 [statutes "do not prohibit lying, they prohibit discrimination"].)  Given the ultimate question the jury was charged with resolving to address York's FEHA discrimination claim, the trial court was not required to give York's special instruction.

### III.

In our original opinion, we awarded defendants costs.  (*York v. City of Sacramento*, *supra*, C097761.)  After granting review, our Supreme Court transferred the case back to us with directions to vacate our opinion and perform the analysis required by *Pollock*, *supra*, 11 Cal.5th 918 before determining whether to award costs to defendants.  No party filed a supplemental brief following the transfer.  (Cal. Rules of Court, rule 8.200(b).)  We conclude that defendants are not entitled to recover their costs on appeal.

In *Pollock*, our state Supreme Court held that section 12965, former subdivision (b), now subdivision (c)(6), which states that "a prevailing defendant shall

20

not be awarded fees and costs unless the court finds the action was frivolous, unreasonable, or groundless when brought, or the plaintiff continued to litigate after it clearly became so," applies to awards of appellate costs. (*Pollock*, *supra*, 11 Cal.5th at pp. 950-951.) In evaluating the merits of a plaintiff's action under this standard, a "court 'should exercise caution to avoid "hindsight bias." ' " (*Id.* at p. 951.)

York's action was unsuccessful, but it was not frivolous, unreasonable, or groundless. (See *Bond v. Pulsar Video Productions* (1996) 50 Cal.App.4th 918, 922 [meritless not defined "simply as the fact that the plaintiff ultimately lost"].) The majority of York's claims survived summary judgment, and some evidence supported his allegations of harassment and discrimination, including Robinson's statements. (See *Robert v. Stanford University* (2014) 224 Cal.App.4th 67, 73 [finding plaintiff's claim frivolous where he "never had or even claimed to have any evidence that race discrimination played a role in his termination other than his own opinion"].) Given this evidence, as well as the lengthy and contentious history of York's employment with the City, we cannot conclude that his action was groundless. (See *Bailey*, *supra*, 16 Cal.5th at pp. 632, 638 [harassment claims evaluated in light of the totality of the circumstances].) Accordingly, defendants are not entitled to costs on appeal.

DISPOSITION

The judgment is affirmed.  The parties shall bear their own costs on appeal.


/s/_____

FEINBERG, J.


We concur:


/s/_____

MAURO, Acting P. J.


/s/_____

RENNER, J.